**Albert J. ENGBRECHT et al., Plaintiffs,**

v.

**DAIRY QUEEN COMPANY OF MEXICO, MISSOURI, et al., Defendants.**

**Civ. No. W–1772.**

United States District Court
D. Kansas.
April 12, 1962.

Adams, Jones, Robinson & Manka, Wichita, Kan., appearing as counsel for plaintiffs.

Thompson, Raymond, Mayer & Jenner, Chicago, Ill., and Foulston, Siefkin, Schoeppel, Bartlett & Powers, Wichita, Kan., appearing as counsel for defendants.

KERR, District Judge (Assigned).

This is an anti-trust action. The thirty-six franchise agreement licensees of Dairy Queen are suing for a declaratory judgment pursuant to Section 2201 of Title 28 U.S.C. Subsequent to

filing this action four additional parties asked and were granted leave to intervene as plaintiffs seeking also to have their franchise agreements declared invalid. The complaint contains four counts, each alleging that the franchise agreements entered into between plaintiffs and defendants are invalid for the reason they violate the Sherman Anti-Trust Act, the Clayton Act and the Anti-Trust laws of the state of Kansas and that they lack mutuality of obligations.

The first claim alleges that the agreements constituting the subject of this controversy, as well as the practices of the defendants in the conduct of their business, run counter to the anti-trust laws and constitute an unlawful restraint of trade, thereby creating a monopoly and generally lessening interstate competition among the several states of the United States. In the second count it is alleged that the agreements are in restraint of trade in that they limit competition and restrict the plaintiffs in the exercise of their rights. Plaintiffs complain further that the agreements are unreasonable and therefore illegal. The third count charges that the agreements are unlawful and invalid in their entirety and that the practices of the defendants are in violation of the anti-trust laws of Kansas. The fourth count avers that the agreements are invalid and unenforceable because they are wholly lacking in mutuality.

The several franchises upon which this action is based contain many detailed prohibitions and conditions by which the parties agreed to abide. In substance they provide that the plaintiffs have the exclusive franchise for the Dairy Queen business for a given area, including the rights to the exclusive use of particular freezers. They grant an exclusive license to use the trademark and name "Dairy Queen" for a term of twenty-five years from the date of the franchise. They provide that the Dairy Queen freezers have a substantial value, that they are being used in many localities in the United States and elsewhere and that the

conditions therein imposed are necessary, equitable and reasonable for the benefit of the parties and all other persons enjoying any lawful interest in the freezers. In the franchises the parties agreed that the trademark and name "Dairy Queen" also has substantial value, that it is also being used in many localities throughout the United States and elsewhere, and that the conditions imposed with respect thereto are necessary, equitable and reasonable for the benefit of the parties and for the protection of the trademark and name. The franchise provides that the plaintiffs may not use the trademark and name Dairy Queen at any place except within the area described; and that if the franchise agreement is terminated all rights to the use of the trademark and name Dairy Queen shall revert to the defendants, which shall be free to enter into a similar Dairy Queen franchise agreement for the area with other parties.

The agreements also provide that the freezers used and operated within the area will be purchased at the cost and expense of the plaintiffs, who agree that, at their own expense, they shall install the freezers and maintain them in a high state of operating condition and repair. Upon termination or expiration of the franchise, defendants are granted the option to purchase all freezers, based upon a price schedule of (1) 20% of the original price if such option is exercised during the first twelve months following the original date of purchase; (2) 40% if the option is exercised during the second twelve months; (3) 60% if such option is exercised during the third twelve months; (4) 80% if such option is exercised during the fourth twelve months; and (5) 90% of such original price if such option is exercised at any time after forty-eight months following the original date of purchase.

The plaintiffs agreed to pay the defendants a fee of thirty cents per gallon on all mix purchased for manufacture into Dairy Queen products during the term of the agreement. To effectuate this latter provision plaintiffs are re-

quired (1) to keep a full and complete record of the conduct of the business, including a record of the serial numbers and locations of all Dairy Queen freezers, and a record of all mix purchased and processed by the Dairy Queen, and said records shall at all reasonable times be available for inspection by an agent of the defendant; and (2) to submit on the first day, and in no event later than the third day, of each month a written report to the defendants on a specified form, listing all mix purchased during the preceding calendar month and to make full remittance to Dairy Queen of all fees due it. The franchises expressly provide that the plaintiffs shall use their best efforts to develop the Dairy Queen business within the area and shall maintain and enhance the high standard of appearance, public approval and acceptance heretofore established for a Dairy Queen business. The plaintiffs further agreed to erect and maintain at their expense an approved Dairy Queen building to be erected on a lot suitable for drive-in accommodations, and large enough to accommodate a large number of automobiles. The plaintiffs agreed to maintain, also at their expense, the Dairy Queen building, to keep it in a high state of repair, cleanliness and sanitation at all times, to paint such building at least annually and to make any reasonable improvements requested by the defendants within a period of thirty days following such request. It was agreed that the plaintiffs would use cones, cups, containers, topping, flavoring, coloring and like materials such as would meet the standards of quality and specifications determined by the defendants and that the prices of any suppliers so designated should be in line with the prices of others engaged in a similar business, giving due regard to the quality, service, financial stability and ability to meet requirements.

The franchises further provide that no product other than Dairy Queen, which shall be made in strict accordance with the formula furnished by the defendant, may be sold by the plaintiffs at any Dairy Queen store or on the premises thereof, or adjacent thereto, without the prior written approval of the defendants. The plaintiffs are prohibited from using the name Dairy Queen in connection with any product other than the product of Dairy Queen freezers and from engaging directly or indirectly in any competitive selling of ice cream, ice milk or any other frozen or semi-frozen dairy product at their Dairy Queen stores or any other location within a radius of ten miles from such stores. This restriction is binding on plaintiffs for a period of two years after the termination of the franchises.

The defendants reserved the right to inspect, sample and test the frozen dairy products, to which the name Dairy Queen was applied, and the mix from which the products were manufactured; to inspect the plaintiffs' operators and employees and the premises, including the lot, building and equipment, machinery and appliances used in the manufacture and sale of Dairy Queen products.

Finally, plaintiffs agreed that these franchises do not confer on them any interest in the trademark and name Dairy Queen nor in any patent. As signatories to the franchise agreement plaintiffs acknowledged that they acquired merely the right to use the trademark and name under the prescribed terms and conditions.

At the time plaintiffs entered into the franchise agreements each had some familiarity with this type of business. Some of them employed counsel before signing the agreement and all had an opportunity to do so. They knew they would be required to operate stores of a prototype design and to sell a particular brand of products. Armed with this knowledge each plaintiff executed the franchise agreement, thereby agreeing to its terms and conditions and accepting its rights and obligations.

The question for decision of the Court is whether the restrictions imposed by the defendants in the franchise agreements go further than reasonably necessary to insure the integrity and quality

of the product and whether they unduly restrain trade in violation of the antitrust laws.

The history of the defendants' activities is essential to an understanding of the issues involved. Defendants conduct their business of using and authorizing others to use the trade name and trademark "Dairy Queen" incident to the making, processing and selling of a particular type of frozen dairy products. They are part of a national system conducted under the trade name "Dairy Queen". They operate in most, if not all, of the states, with a total of 3400 retail stores. Franchise agreements have been issued to approximately 90 stores in Kansas in addition to the licenses or franchises granted to the plaintiffs.

In keeping with their practice and policy the defendants have inspected and supervised the operations of all the Dairy Queen stores in Kansas. In general the inspectors do whatever is appropriate and necessary to operate in a profitable manner. They advise and counsel concerning the methods used to increase sales. They assist in the maintenance and upkeep of the freezers and other equipment. It is their duty to determine temperatures, taste, color, weight, appearance and other characteristics of Dairy Queen products. Obviously the purpose of the inspections is to enforce strict compliance with the franchise agreements and to maintain uniformity of operation and appearance of defendants' licensed stores.

To promote the Dairy Queen business defendants have maintained at their own expense membership in the Dairy Queen National Trade Association and its successor, the Dairy Queen National Development Company. The object of these associations is to promote the Dairy Queen business on a national basis. In the state of Kansas the defendants have carried on a program of advertising and they have reimbursed a fixed percentage of its licensees' advertising expense.

There appears to be little, if any, dispute in the evidence relative to supplies. A special type of mix was required but, to stimulate competition, defendants endeavored to interest a number of creameries in Kansas to bid on the mix. The evidence is clear that more than one approved mix is available to the plaintiffs. In the Supplemental Pretrial Order filed herein this Court has held the mix is not a secret formula. It is not now contended that the defendants have any interest in the mix or have ever received a kickback from any source.

To maintain uniformity and identity the defendants required the plaintiffs to dispense their products in paper cups and other containers having imprinted Dairy Queen design. Defendants do not make or sell these imprinted designs and they have no financial interest in the manufacture or sale thereof. The defendants have approved various brands of toppings for use by the plaintiffs, such as hot fudge, chocolate, etc. Plaintiffs are free to make purchases of toppings from any source so long as they meet the required standard. The evidence discloses that the only supplies sold by the defendants to plaintiffs are items such as handbills, menu boards and small parts for the freezers.

Though plaintiffs knew of the restrictions when they entered into the franchise agreements, they now complain that they were prohibited from selling non-Dairy Queen foods from inside the Dairy Queen stores in Kansas. In some other states licensees are permitted to sell goods other than Dairy Queen in Dairy Queen buildings. Some of the Dairy Queen licensees testified they did not approve the sale of food from Dairy Queen stores. There is credible evidence that the sale of food from Dairy Queen stores would have an adverse effect on the sale of Dairy Queen products. Some of the witnesses testified the Dairy Queen building was inadequate to handle both Dairy Queen and non-Dairy Queen foods.

The evidence is clear that licensees are permitted to sell Coca Cola, root beer and similar drinks but the defendants have maintained control on the advertising of such items in and about the stores.

The plaintiffs urge (a) that the control over the freezers through the repurchase option is an unreasonable restraint of trade and a misuse of the patent in violation of the anti-trust laws and also an unlawful attempt to extend the patent monopoly after expiration of the patent; (b) that the exclusive dealing, restrictive and tying arrangements imposed by defendants upon the plaintiffs are clear violations of the Sherman Act, of the Clayton Act and of Section 5 of the Federal Trade Commission, 15 U.S.C.A. § 45; (c) that the exclusive dealings are not only unreasonable restraints of trade under the anti-trust laws, but also under the common law; (d) that the restrictive dealings are also unlawful under the anti-trust laws of the state of Kansas; and (e) that an attempt by the defendant to fix prices at which plaintiffs sell Dairy Queen products is unlawful.

The freezers used by the licensees, called "Dairy Queen freezers", were first manufactured under United States Letters Patent No. 2,080,971, which patent expired according to law on May 18, 1954. Both before and after that date defendants used this type of freezer exclusively in Dairy Queen stores which they owned, operated and leased. The franchises required all licensees to purchase from defendants this type of freezer upon the execution of the agreement and the same contract gave the defendants an option to repurchase all freezers within ninety days from the date of the termination of the franchise agreement.

Counsel for plaintiffs argue that since this is the only freezer approved by the defendants the sale of Dairy Queen products is conditioned upon the purchase and use of the freezer, and such conduct constitutes a "tying agreement to suppress competition" as condemned by the decision in Standard Oil Company of California and Standard Stations et al. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. The evidence discloses the defendants are not the owners of the patent and have no interest in the patent except as licensees. This type of freezer was used by the defendants both before and after the patent expired and is the only freezer approved by them in the making of its soft freeze. Plaintiffs argue such arrangement prohibits the operators from dealing with suppliers of their own choice and foreclose the operators from making their own contracts and bargains for such freezers, thereby lessening competition and tending to create a monopoly.

In Tampa Electric Co. v. Nashville Coal Co. et al., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580, it was said that Section 3 of the Clayton Act condemned sales or agreements "where the effect of such sale or contract would under the circumstances disclosed probably lessen competition or create an actual tendency to monopoly". This was not to say, the Court emphasized, that the Act was intended to reach "every remote lessening" of competition but only those which were "substantial". The Court did not draw the line where "remote" ended and substantial began. At page 327, 81 S.Ct. at page 628 it said:

"In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Following the guidelines of earlier decisions, certain considerations must be taken. First, the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. Second, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected."

Again, at page 329, 81 S.Ct. at page 629, the following language expresses the guidepost to be followed by the court:

"To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence."

Several other types of freezers which process soft frozen ice cream have been developed since defendants commenced their operations. Defendants contend, however, that only this type of freezer, when used with the mix prepared in accordance with their specifications, will produce the type of soft freeze required by defendants for sale under their trade name. Plaintiffs' evidence falls short of showing any other type of freezer which would produce a product satisfying the defendants' standard for quality. Further, the evidence discloses that in many instances the freezers are purchased as a part of a single transaction when the purchaser acquires an existing Dairy Queen store. In this type of case whatever moneys the plaintiffs paid were paid to their respective predecessors and not to the defendants.

In 1952 defendants removed from their franchise agreement a provision which fixed the retail price of items to be sold by the licensees and the licensees agreed not to deviate from the prices so set. There are instances where defendants have issued weight specification cards. These cards have been issued each year since 1953 and give the prices charged in defendants' owned stores. Plaintiffs argue the inference to be drawn from the issuance of the cards is to the effect that defendants were setting the price to be charged by the licensees. There is additional evidence that in June 1955 the defendants placed an advertisement in Life magazine advertising a fifteen cent sundae and in June 1956 a sixteen cent sundae was advertised in the same publication. At other times hand bills have been distributed, giving the price of items on sale days. The cards, hand bills and two advertisements constitute all of plaintiffs' evidence in support of the allegation of the complaint that defendants, by means of their advertising practices, have "fixed the prices to be charged by operators and by such means have forced and coerced the operators to sell Dairy Queen products at prices fixed and determined by defendants".

To hold the defendants' fixed prices on the Dairy Queen items sold by the licensees would require the Court to discard the testimony of the plaintiffs in respect thereto. The plaintiffs testified that they and they alone determined the retail prices on Dairy Queen items. There is some evidence on the part of the plaintiffs that the local licensees in a given area would collaborate and more or less determine the price to be charged in a given area.

■ An agreement in restraint of trade is illegal at common law and under the Sherman and Clayton Acts only if the restraint is unreasonable. The test as to whether or not a restraint of trade is unreasonable has been stated in this manner:

"A restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification if it

(a) is greater than is required for the protection of the person for whose benefit the restraint is imposed, or

(b) imposes undue hardship upon the person restricted, or

(c) tends to create, or has for its purpose to create, a monopoly, or to

control prices or to limit production artificially, or

(d) unreasonably restricts the alienation or use of anything that is a subject of property, or

(e) is based on a promise to refrain from competition and is not ancillary either to a contract for the transfer of good-will or other subject of property or to an existing employment or contract of employment." Restatement, Contracts, § 515.

The ground on which agreements in restraint of trade are held illegal is that they are contrary to public policy, but before the parties can be absolved from their agreement on this ground it must be clearly evident that the agreement is injurious to public welfare since it is also a principle of law to hold persons to their contracts. See 17 C.J.S. Contracts § 238.

The cases cited by counsel are many but the reasonableness or unreasonableness of an agreement cannot be determined nor measured by any fixed formula of legal interpretation. The rules are but guides to the decisions. The reasonableness of the restraint is to be determined by the circumstances of the case and the particular contract involved in it. Gibbs v. Consolidated Gas Company of Baltimore, 130 U.S. 396, 9 S.Ct. 553, 32 L.Ed. 979.

Here we are dealing with a commodity old as the dairy business itself—a soft-mix ice cream—available in almost every restaurant, inn, eating place, drug store and crossroad. It may be had in any degree of viscosity, in any flavor—vanilla, chocolate, strawberry, orange, lemon and lime. It may be commercially processed or privately prepared and frozen. It is extremely doubtful that the Dairy Queen processing in the light of Tasti-Freeze, Ar-Tik, and sundry and divers other soft-mix freeze now available, materially restrains commerce or could be considered as a monopoly in the channels of interstate commerce.

It is not the public nor one who has been injured who complains to this Court about the alleged illegality of these franchise contracts. Rather, it is the parties themselves who, having willingly executed the contracts, now seek refuge in the halls of justice. The law cannot absolve plaintiffs from their voluntarily acquired obligations, nor can it condemn the defendants for their protective covenants, unless or until it is shown that the agreements are manifestly injurious to the public. It must not be overlooked that public policy not only recognizes the sanctity of contracts but it also denounces the insidious contract in restraint of trade. The former will not be disturbed; the latter will not be tolerated.

In Printing and N. R. Co. v. Sampson, L.R. 19 Eq., 462, 465, it was said: "It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice".

A review of the evidence, the exhibits, the decided cases, together with the reasonable inference to be drawn from the evidence, persuades me that the plaintiffs have failed to support by a preponderance of evidence the material allegations contained in each of the four claims of the complaint.

From what I have said I hold the franchise agreements are lawful, that they are not in conflict with Section 3 of the Clayton Act, 15 U.S.C.A. § 14, that they do not violate Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, nor the Anti-Trust laws of the state of Kansas, that they are not an unreasonable restraint of trade at common law, and that they are founded upon mutuality with ample consideration, and are legal, binding and enforceable contracts.

Defendants will prepare findings of fact and conclusions of law in conformity with this memorandum and submit the same within twenty (20) days from the date hereof, together with judgment, defendants to have their costs to be assessed by the clerk.