Bernard SUSSER et al., Plaintiffs-Appellants,

v.

CARVEL CORPORATION, Carvel Dari-Freeze Stores, Inc., Carvel Stores Realty Corporation, et al., Defendants-Appellees, And Eight Other Cases.

United States Court of Appeals
Second Circuit.

Argued Oct. 24, 1963.

Decided May 8, 1964.

Sidney W. Rothstein, New York City (Joseph L. Klein, Greenfield, Rothstein & Klein, New York City, on the brief), for plaintiffs-appellants Bernard Susser, et al.

Herman L. Weisman, New York City (Herbert F. Roth, Amen, Weisman & Butler, New York City, on the brief), for defendants-appellees Carvel, et al.

William G. Mulligan, New York City, for defendant-appellee Rakestraw's Dairy Products.

John A. Wilson, New York City (Willard M. L. Robinson, Shearman & Sterling, New York City, on the brief), for defendant-appellee H. P. Hood & Sons, Inc.

Irving L. Weinberger, New York City (Albert L. Wigor, New York City, on the brief), for defendant-appellee Eagle Cone Corp.

Before LUMBARD, Chief Judge, and MEDINA and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge (writing for the majority in part and dissenting in part).

The plaintiffs in nine actions which were tried together in the Southern District of New York appeal from the dismissal of their complaints which alleged violations of the antitrust laws and sought treble damages from the Carvel Corporation, a New York corporation which manufactures dairy and primarily soft ice cream products, its subsidiary organizations, certain of its individual officers and attorneys, and a number of its suppliers. The plaintiffs, former and present individual operators of Carvel franchise outlets in Massachusetts, Connecticut and Pennsylvania, also charged the Carvel defendants with fraudulent misrepresentations in the franchise negotiations.

After a separate trial of the fraud charges Judge Dawson, sitting without a jury, dismissed the complaints as to these charges on February 7, 1962. The issue of liability on the antitrust causes of action was tried separately before Judge Dawson without a jury. The plaintiffs alleged that Carvel had unlawfully fixed the prices of the retail products sold at the franchise stores and that the franchise agreements embodied tying and exclusive dealing arrangements violative of the Sherman and Clayton acts. The complaints also charged that the contracts between Carvel and the supplier defendants embodied concerted refusals to deal with the plaintiffs violative of the antitrust laws. In a pretrial order the plaintiffs stipulated that they would rely solely upon "per se" violations of the antitrust laws as shown in certain written agreements and other documents. From a judgment which, with one exception,[1] dismissed the complaints against all the defendants on the ground that the plaintiffs had failed to prove violations of the antitrust laws, 206 F.Supp. 636 (S.D.N.Y.1963), the plaintiffs appeal.

### THE CARVEL FRANCHISE SYSTEM

Although the franchise operators conduct their stores as independent businessmen, through provisions in the franchise agreement Carvel is able to maintain a chain of 400 stores uniform in appearance as well as in operation. The dealer is obligated to conduct his business in accordance with a Standard

---

1. Judge Dawson held invalid the pricing provisions of the pre-1955 franchise agreement.

Operating Procedure Manual (Manual) which governs in great detail the general operation of the store, including the types of products which may be offered for sale, the recipes for their preparation, the nature and placement of advertising displays in the store, the color of the employees' uniforms, and the hours when the store lights must be turned on. The stores are identical in design, each featuring the Carvel crown and cone trademark on a flat slanting roof, glass walls at its front, and the name "Carvel" on its sides in neon lights. This distinctive design is protected by a design patent. The ice cream, which is processed from a mix prepared from a secret formula, is dispensed from a patented machine which bears the Carvel name or trademark. The paper containers, ice cream cones, and spoons all bear the Carvel name and in some instances are unique in design.

The Carvel chain of franchise stores has grown from approximately 180 in 1954 to approximately 400 at the time of trial in 1962. The stores are presently located throughout the eastern portion of the United States from Maine to Florida and as far west as Wisconsin. Their annual gross sales are from six to eight million dollars. Carvel's sales to the stores of supplies, equipment, and machinery reached a high point of $5,-532,396 in 1957 and in 1960 totalled $4,-460,689.

Special counsel retained by Carvel in 1955 for that purpose drafted a new form of the franchise agreement. The plaintiffs in four of the actions entered into franchise agreements prior to 1955; the plaintiffs in the remaining actions became franchisees after 1955. Both agreements and the corresponding Manuals must therefore be scrutinized. The new agreement effected two important changes. First, whereas under the earlier agreement the franchise dealer was obligated to sell Carvel products

at prices fixed by the parent organization, the new agreement explicitly provides that the dealer has the right to fix his own prices. Second, under the earlier agreement the dealer was obliged to purchase his entire requirements of supplies, machinery, equipment, and paper goods from Carvel or Carvel approved sources. The new agreement requires the purchase from Carvel or Carvel approved sources only of those supplies which are a part of the end product sold to the public and permits the dealer to purchase machinery, equipment, and paper goods from independent sources so long as his store is maintained in accordance with the Manual specifications.

### PRICE-FIXING

It is undisputed that the pre-1955 Manual established "standard selling prices" to which the dealers were obligated to adhere. The pre-1955 franchise required the dealers "To maintain prices on products designated in, and as per Carvel Standard Operating Procedure and not to conduct any reduced price sales of these items without written consent from Carvel." Judge Dawson held that these price-fixing provisions were illegal and that the four plaintiffs who had entered into the earlier franchise were entitled to a trial on the issue of damages. No appeal was taken from this aspect of the judgment below.[2]

The revised franchise provides: "The dealer shall have the right to sell Carvel's Frozen Dairy Product and/or other items authorized for sale by him under the terms of this agreement at any price that the dealer determines. Wherever Carvel recommends a retail price, such recommendation is based upon Carvel's experience concerning all factors that enter into a proper price; but such recommendation is in no manner binding upon the dealer." The appellants contend that notwithstanding this provision Carvel effectively continued to fix prices at

---

2. In accordance with Rule 54(b) of the Federal Rules of Civil Procedure Judge Dawson, finding no good reason for delay, directed the entry of judgments in all the actions, although damages were yet to be ascertained in four of the cases.

which Carvel products were sold to the public and that Judge Dawson's finding to the contrary is clearly erroneous.

■ Even in the absence of express contractual provisions which evidence an unlawful scheme, a charge of unlawful price-fixing may be substantiated by proof of a course of conduct by which the seller or licensor effectively maintains control of the ultimate retail price at which a product is sold. Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L. Ed. 307 (1922). The appellants direct our attention to the fact that six pages of the revised Manual continued to refer to "Standard selling price"; that in letters to several dealers Carvel emphasized that only 10¢ and 20¢ cones were prescribed by the Manual and that the minimum portions prescribed by the Manual were mandatory; that Carvel sought to have dealers report to it any deviation by other dealers from the requirements of the Manual; and that Carvel suggested that dealers seek its permission before conducting a sale at prices other than those established in the Manual. Moreover, the appellants emphasize the existence of a board of governors consisting of various dealers appointed by Carvel, the function of which is to make recommendations concerning the suggested retail selling price of Carvel products.

■ As Judge Dawson noted, the mere existence of a means whereby retail price levels are recommended is not sufficient to establish a violation of the Sherman Act, unless there is a showing of an attempt to enforce a price structure upon the retail tradesmen. See Maple Flooring Mfrs.' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); Cement Mfrs.' Protective Ass'n v. United States, 268 U.S. 588, 45 S. Ct. 586, 69 L.Ed. 1104 (1925). Here, the franchise provisions explicitly reserved to the individual dealer the right to set whatever price he desired. And,

by contrast with the letters to which the appellants referred, Carvel introduced in evidence bulletins circulated to all the dealers as well as letters sent to several emphasizing that Carvel had changed its prior pricing policy and that each dealer now had the right to set his own prices, although Carvel did indicate that its suggested retail prices were based upon its own broad experience in customer sales.

Fred Vettel, Carvel's general manager since 1955, testified that the board of governors operated primarily as a medium for the interchange of ideas among a representative group of individual franchise dealers. He further stated that since sometime in 1957 Carvel had made available to the dealers advertising displays which left blank spaces for those dealers who wished to insert prices other than those suggested by the Carvel organization, although the appellants adduced evidence that on some occasions requests for such posters were refused.

■■ In short, the evidence was contradictory on the question whether Carvel attempted to impose a binding price structure on the retail dealers. It is not the duty of this court to consider *de novo* the conflicting evidence and resolve this factual issue; rather, we must review the determination of the district court to determine whether or not it is clearly erroneous. See Ruby v. American Airlines, Inc., 2d Cir., 329 F.2d 11 (1964); United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 494–496, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). There is much evidence to support Judge Dawson's finding of fact that Carvel did not engage in an unlawful price-fixing scheme, and we cannot say that Judge Dawson's conclusion was clearly erroneous.[3]

### EXCLUSIVE DEALING AND TYING ARRANGEMENTS.

The appellants maintain that the franchise agreements embody violations of

---

3. We thus need not decide whether the products allegedly the subjects of unlawful price-fixing were sufficiently a part of interstate commerce to sustain a charge of Sherman Act violation.

the Sherman [4] and Clayton [5] acts insofar as they require the dealer to refrain from selling any non-Carvel product and insofar as they obligate the dealer to purchase directly from Carvel or from a source approved by Carvel his supply not only of the basic Carvel ice cream mix, prepared under a secret formula, but also certain other products used in either the preparation or sale of the end product offered to the public. The requirement that the dealer sell solely Carvel products would, if taken alone, present an example of an exclusive dealing arrangement; the requirement that the dealer purchase not only Carvel mix but also certain other products would, if taken alone, present an example of a tying arrangement. Inasmuch as the Supreme Court has erected a much more stringent test of legality with which to measure tying arrangements than that which is applied to exclusive dealerships, we consider first the appropriate standard to be applied where both provisions are embodied in a single contractual relationship.

■ We can find no justification for treating the tying aspects of an agreement which embodies exclusive dealing aspects as well any differently than we would treat a tying arrangement alone. The fundamental economic evil in a tying arrangement deemed unlawful under the antitrust laws lies in the ability of a producer who possesses market dominance in one particular product to impose upon his vendee the obligation to purchase other products as to which the producer possesses no market dominance and the consequent foreclosure to other producers of the non-dominant products of such markets for their merchandise. Certainly the economic impact of such an arrangement is in no respect diluted by inclusion of provisions which restrict the vendee solely to the use or sale of the producer's products. We shall therefore measure the tying aspects of the Carvel franchise by the more stringent standard of legality established by the Supreme Court and the exclusive dealing aspects by the more liberal standard.

As noted above, the pre-1955 franchise obligated the dealer to "purchase and use only standard Carvel approved printed paper goods, napkins, cones, extracts, spoons, and all other Carvel products at standard market prices." The post-1955 franchise requires the dealer to purchase from Carvel or approved sources his entire requirements of all items sold as a part of the retail product but permits the dealer to purchase machinery, equipment, and paper goods from sources oth-

4. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:
   "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *"
   Section 2, 15 U.S.C. § 2, provides:
   "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

5. Section 3 of the Clayton Act, 15 U.S.C. § 14, provides:
   "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

**512**

er than Carvel so long as the operation is maintained in accordance with the Manual specifications.[5a]

*The Tying Arrangements*

Tying arrangements have been given short shrift under the antitrust laws. International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). See generally Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L.Rev. 50 (1958). Yet it seems clear that in compelling circumstances the protection of goodwill, as embodied for example in a valuable trademark, may justify an otherwise invalid tying arrangement. But "[t]he only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute [for the tied product] would be so detailed that they could not practicably be supplied." Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). The threshold question is thus whether the Carvel franchise embodies a tying arrangement and, if so, whether that arrangement can be justified as necessary for the protection of Carvel's goodwill.

■ A tying arrangement may be defined as an agreement under which the vendor will sell one product only if the purchaser agrees to buy another independent product as well. Two types of economic injury characteristically arise from such an arrangement: first, foreclosure to the vendee of alternate sources of supply for the second, or tied, product; and second, foreclosure of possible market outlets to other competing suppliers of the tied product. The source of this injury—and the fundamental element which requires that such arrangements be deemed illegal—lies in the vendor's "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." Northern Pacific Railway Co. v. United States, supra, 356 U.S. at p. 6, 78 S.Ct. p. 518. Such power may be found either in the vendor's dominance of the market in the tying product or in its uniqueness or particular appeal to the consumer. United States v. Loew's, Inc., supra, 371 U.S. at p. 45, 83 S.Ct. 97.

■ My brothers would affirm the judgment of the district court in all respects. With regard to the allegations of unlawful tying arrangements, they reason that the plaintiffs limited themselves by pre-trial stipulation to reliance solely on "per se" violations of the antitrust laws and since they failed to establish Carvel's market dominance and that a substantial amount of commerce is affected they have failed as well to make out a *per se* violation of the antitrust laws. I cannot agree.

The stipulation, in relevant part, states only that the plaintiffs will rely on *per se* violations and that their proofs will be limited to the written franchise agreements, other documents supplementary thereto, and the testimony of two individuals taken prior to trial, one of whom was Fred Vettel, Carvel's general manager. The effect of this stipulation seems clear to me. The plaintiffs agreed that they would go no further than the documentary evidence alluded to in attempting to make out their claims of antitrust violation. The only question is whether the plaintiffs in fact introduced sufficient evidence to make out an anti-

5a. The post-1955 agreement provides that "[i]n the event that the Dealer desires to purchase his printed goods from sources other than Carvel, Carvel shall license manufacturers of such products to print the Carvel name thereon in connection with sales to the Dealer, with products made in accordance with Carvel standards."

trust violation by the Carvel defendants. I think they did. The nature of their stipulation and the label they gave it is wholly immaterial to that question. I cannot see what can possibly turn on the fact that the plaintiffs limited themselves to what the stipulation termed "per se violations."

The court's focus must be entirely on the state of the record. The crucial question is whether the record satisfies the requirements of proof of an antitrust violation. Each element of a tying arrangement must be considered in turn.

Does Carvel possess the requisite economic leverage? Despite the absence in the record of substantial economic data, in the light of the Supreme Court's decision in United States v. Loew's, Inc., supra, I believe that such power may be presumed from the use of the Carvel trademark as the principal feature of the Carvel franchise system. In Loew's, the Court declared that "when the tying product is patented or copyrighted * * sufficiency of economic power is presumed." 371 U.S. at 45, 83 S.Ct. at 2102, n. 4. I can find little reason to distinguish, in determining the legality of an allegedly unlawful tying arrangement, between the economic power generated by a patent or copyright on the one hand and that generated by a trademark on the other. In all three cases, the Congress has granted a statutory monopoly which places in the hands of the owner the right, within the limitations of federal law, to do as he will with the protected product. The value of the patent, copyright or trademark is, of course, directly proportionate to the consumer desirability of the protected product.

I can find no reason not to extend this presumption of economic power to trademarks.[6] In any event, the claims which Carvel itself proffers lend added weight to the presumption, for Carvel's claim of economic justification is founded upon the substantial value of its trademark and the necessity for contractual restraints upon its dealers to protect that value. No doubt the recent growth of the Carvel chain from 180 to 400 stores has been attributable in great measure to the increasing value of the Carvel trademark in terms of consumer appeal and the concomitant increase in economic power generated by that trademark. The essential element in the Carvel franchise is the trademark license agreement which permits the dealer to display, label and sell its retail products as "Carvel" products. To reinforce its basic trademark Carvel also possesses some nine design patents covering its building structure, advertising displays, freezers and other apparatus, three patents covering machinery and some twenty trademarks in varying forms for use with the wide variety of products which are merchandised at the franchise stores.[6a] It is the lease or license of the trademark itself, buttressed by this array of patents and subsidiary trademarks, to which are tied the other products.

Having concluded that the Carvel trademark presumptively generates sufficient economic power, we must consider two arguments advanced to support the proposition that the Carvel franchise in any event does not embody an unlawful tying arrangement within the provisions of the Clayton Act. First, it is contended that section 3 of that act condemns only agreements which obligate the purchaser not to "use or deal in the goods * * * of a competitor or competitors of the lessor or seller," and that

6. The protection given to trademarks is in some respects even more extensive than that given either patents or copyrights. The duration of a trademark, for example, may, during continued use, be extended beyond 20 years without limit of time, 15 U.S.C. §§ 1058–59, whereas a patent expires after 17 years, 35 U.S.C. § 154, and a copyright after 28 years, subject to a renewal period of 28 years, 17 U.S.C. § 24.

6a. Exhibit C-2, introduced by the Carvel defendants, is comprised of these 32 patents, design patents, and trademarks, including, for example, design patent # 169,055, issued on March 24, 1953, covering the building structure; patent # 2,731,925, issued on January 24, 1956, covering the one piece barrel end and dispenser tip; and design patent # 184,983, issued April 28, 1959, covering a top unit for vending motor vehicles.

since Carvel does not compete with suppliers of cones, toppings, extracts, ice cream mix and so forth there has been no improper foreclosure of competition. Generally, Carvel's suppliers accept orders directly from the dealers, bill the dealers and deliver directly to them rather than to Carvel. However, the transaction is cast in the form of a sale directly to Carvel which in turn resells the items to the individual dealers, the suppliers acting as Carvel's agents for payment and delivery. Carvel sets the prices at which these items are sold to the dealers. From the point of view of the legal form adopted, then, it is clear that Carvel does compete with other suppliers of these products. Moreover, there is little difference in economic impact between Carvel's purchasing and reselling these supplies and Carvel's production of these items in the first instance.

With regard to the foreclosure to other suppliers of the Carvel franchise stores as possible market outlets, it must be conceded that vigorous competition would probably exist among such suppliers to secure the initial contract with the Carvel organization. Nevertheless, the nature of this competition must be substantially different from that which would otherwise prevail. In view of the leverage which the Carvel corporation wields in supervising the supplying of some 400 retail outlets, competition will most likely take the form of substantial price concessions and the concomitant inability of smaller suppliers effectively to compete with larger producers who are capable of meeting Carvel's price and service demands.

Of equal significance is the economic impact of the prevailing arrangement in terms of foreclosure to the individual franchise stores of the opportunity to deal with individual suppliers. While under the franchise the dealer may enjoy lower prices on some items,[7] Carvel

undoubtedly reaps some economic benefit from its status as an intermediary.[8] There is no indication whether or not the dealers, either individually or in combination, could secure lower prices and better service from local producers of the same products. In short, in order to secure the benefits of employing the Carvel name on his retail products, the dealer has been forced to surrender his right to negotiate with suppliers of his own choice on matters such as price, delivery and other aspects of a contract of sale. Where such a surrender may be traced to the economic leverage of the other party, arising from its trademark, the elements of an unlawful tying arrangement have been established. Certainly the amount of commerce here involved is not insubstantial, in light of Carvel's sales to the franchise dealers in 1960 alone of $3,965,923 in ingredients and other supplies.

The second argument advanced in support of the proposition that the Carvel franchise does not embody a tying arrangement is that we are dealing not with a series of individual products tied together for purposes of sale, but rather with one unified product, that is the Carvel product which is ultimately consumed by the public. I do not agree. Carvel sells supplies as distinct items in large quantities—for example, ten gallons of mix, ten gallons of chocolate syrup, and so forth. Carvel itself purchases these supplies as distinct items from a wide variety of suppliers who in turn make individual deliveries to the franchise outlets. By their very nature it seems clear that there is no reason to treat these separate products as one unified product although to the ultimate consumer of an ice cream cone or a sundae they would seem to be one.

The plaintiffs having proved the essentials of a tying arrangement proscribed by the Clayton Act, the burden fell

---

7. For example, the evidence indicated that an ice cream cone similar to that for which the dealers paid $4.80 per 600 to Carvel was listed on Eagle Cone Corporation's wholesale price list at $5.60 per 600, in lots of 25 cases or more.

8. For example, the evidence indicated that Carvel charged the dealers $10.00 per thousand for ice cream cones which it purchased for $9.50 from the cone manufacturer.

upon Carvel to justify the arrangement as reasonably necessary to protect its trademark. While it is clear that some quality control is essential for the protection of Carvel's goodwill—if not required by law for a proper trademark licensing agreement, see E. I. Du Pont De Nemours & Co. v. Celanese Corp. of America, 167 F.2d 484, 35 C.C.P.A. 1061, 3 A.L.R.2d 1213 (1948); Arthur Murray, Inc. v. Horst, 110 F.Supp. 678 (D. Mass.1953); Morse-Starrett Prod. Co. v. Steccone, 86 F.Supp. 796 (N.D.Calif. 1949)—the justification for this control requires proof that the specifications for products to substitute for those offered by Carvel would be so complex and detailed as to. make it impracticable for Carvel to establish such specifications. See Standard Oil Co. of Cal. v. United States, supra, 337 U.S. at 306, 69 S.Ct. 1051.

I find the record with respect to justification of Carvel's control to be unsatisfactory and inconclusive. The evidence before Judge Dawson was for the most part documentary. With the exception of the self-serving statement in the franchise agreement that the dealer's obligation to purchase only from Carvel those items which are part of the end product is necessary "[i]n order to safeguard the integrity of Carvel's trademarks," the documents are of little value on the issue of trademark justification. Vettel, Carvel's general manager, testified that the various toppings and other garnishments are made by the suppliers to Carvel's specifications, although not under a secret formula as is the basic ice cream mix. Vettel stated that it would be "impossible" to police the individual stores; yet he conceded, as did a representative of H. P. Hood & Sons, a supplier to Carvel of ice cream mix, that the toppings and garnishments sold by Carvel to the dealers could be purchased elsewhere on the market.

In light of this sparse showing, I am unable to find sufficient support for Judge Dawson's conclusion that the tying arrangement was justified by the necessity for Carvel to establish quality controls to protect its trademark. My brothers suggest the difficulty of "controlling something so insusceptible of precise verbalization as the desired texture and taste of an ice cream cone or sundae." Yet, since Carvel itself manufactures none of the ingredients sold to the dealers, it has itself apparently surmounted the difficulty of verbalizing the recipes for the proper preparation of its ingredients. It is especially noteworthy that in Engbrecht v. Dairy Queen Co., 203 F.Supp. 714 (D.Kans.1962), it was established that Dairy Queen, which operates a nationwide chain of some 3,400 soft ice cream franchise stores quite similar to Carvel's, does not require that its dealers purchase mix, toppings, or other garnishments directly from it or from approved sources, but instead it establishes specifications to govern such items and enforces these by means of periodic inspection of its franchise stores. This fact is by no means conclusive of the ability of Carvel, a somewhat smaller chain, to maintain its own standards of quality through similar controls, since the circumstances may differ, but it negates the proposition that it is logical and reasonable to infer—in the absence of proof more compelling than the mere self-serving statement of Carvel's own general manager—that it was reasonable and necessary for Carvel to embody a tying arrangement into its franchise agreement. Dairy Queen poses in striking contrast the insufficiency of the evidence adduced by Carvel to support its claim.

The antitrust aspects of the plaintiffs' claims were tried more or less as the aftermath of the far more lengthy fraud and deceit aspects of the case. Apparently because of all the time already spent in litigating the other issues, counsel were urged by the district court to limit their proofs in the antitrust phase of the case essentially to documentary evidence, and this may explain as well the plaintiffs' reliance solely on "per se" violations of the antitrust laws. With the case in this posture, I would think it best to remand the cause to the dis-

trict court for a further hearing limited to the issue of justification. If Carvel could establish its claim the result ultimately would be the same. If Carvel were unable to do so the plaintiffs would have sufficiently established all the elements of an unlawful tying arrangement.

### The Exclusive Dealing Arrangements

As we have noted, our application of the stricter standard of legality established by the Supreme Court to the tying aspects of the Carvel franchise does not preclude us from applying the more flexible standard established by the Court for exclusive dealing arrangements to the requirement in the franchise that the dealer sell at retail only Carvel or Carvel approved products. The plaintiffs maintain that this provision erects an unlawful exclusive dealership violative of the antitrust laws. We do not agree.

In Tampa Electric Co. v. Nashville Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the Supreme Court held valid a contract between Tampa, a public utility, and Nashville, a medium sized coal company, which obligated Nashville to supply Tampa's entire requirements of coal over a twenty-year period—one form of an exclusive dealing arrangement. After discussing the necessity of delineating the relevant line of commerce and the geographical market, the Court noted that requirements contracts "have not been declared illegal per se" and stated that in determining whether or not the contract in issue would substantially lessen competition the courts must take into account "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." 365 U.S. at 329, 81 S.Ct. at 629. The Court further emphasized the significance of the possible economic justification for the accused arrangement, in light of the

legitimate reasons for employing such a device.

Lacking economic data sufficient to meet the standard thus established in Tampa Electric, the appellants here urge that the Supreme Court's decision in Standard Oil Co. v. United States, supra, is controlling and that they need prove only that "competition has been foreclosed in a substantial share of the line of commerce affected." 337 U.S. at 314, 69 S.Ct. at 1062. We need not comment on whether the appellants could sustain their allegations under the doctrine enunciated in Standard Oil, for it seems indisputable that in Tampa Electric the Court deviated from the more rigorous and inflexible rule it had established in Standard Oil and erected criteria which demand close scrutiny of the economic ramifications of an exclusive dealing arrangement in order to determine the probable anti-competitive effects of such a device. See Bok, The Tampa Electric Case and the Problem of Exclusive Arrangements Under the Clayton Act, 1961 Sup.Ct.Rev. 267, 281–85. We find it plain that the appellants have failed to bear this burden. Instead of introducing evidence to establish the economic effects of the Carvel franchise structure, they merely protest that anti-competitive effects may be inferred solely from the existence of such a network of exclusive dealerships. But the whole tenor of Tampa Electric does not permit adherence to such a stringent standard of legality.

In any event, we need not rely solely upon the appellants' failure to adduce concrete evidence concerning the relevant line of commerce and geographical market and the probable anticompetitive effects of the Carvel arrangement. For in terms of at least one factor which the Supreme Court deemed significant in Tampa Electric—that of economic justification—the Carvel exclusive dealership arrangement withstands any attack on its legality.

As Judge Dawson found, "the cornerstone of a franchise system must be the trademark or trade name of

a product." The fundamental device in the Carvel franchise agreement itself is the licensing to the individual dealer of the right to employ the Carvel name in his advertising displays, on the products he sells, and on the store itself. The stores are uniform in design as well as in the public display of the ice cream machinery employed, the placement of advertising displays, and the products offered for sale. The requirement that only Carvel products be sold at Carvel outlets derives from the desirability that the public identify each Carvel outlet as one of a chain which offers identical products at a uniform standard of quality. The antitrust laws certainly do not require that the licensor of a trademark permit his licensees to associate with that trademark other products unrelated to those customarily sold under the mark. It is in the public interest that products sold under one particular trademark should be subject to the control of the trademark owner. See E. I. Du Pont De Nemours & Co. v. Celanese Corp. of America, supra; Arthur Murray, Inc. v. Horst, supra; Morse-Starrett Prod. Co. v. Steccone, supra. Carvel was not required to accede to the requests of one or another of the dealers that they be permitted to sell Christmas trees or hamburgers, for example, which would have thrust upon Carvel the obligation to acquaint itself with the production and sale of these items so as to establish reasonable quality controls.

Nor do the antitrust laws proscribe a trademark owner from establishing a chain of outlets uniform in appearance and operation. Trademark licensing agreements requiring the sole use of the trademarked item have withstood attack under the antitrust laws where deemed reasonably necessary to protect the goodwill interest of the trademark owner, see Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403 (5 Cir. 1962); Pick Mfg. Co. v. General Motors Corp., 80 F.2d 641 (7 Cir. 1935), and such agreements certainly are not unlawful *per se* under the antitrust laws. Bascom Launder Corp. v. Telecoin Corp.,

204 F.2d 331 (2 Cir. 1953). Judge Dawson was fully warranted in concluding that in the context of the entire Carvel franchise system the requirement that no non-Carvel products be sold at the retail level is reasonably necessary for the protection of Carvel's goodwill.

### THE SUPPLIER CONTRACTS

The appellants maintain that the agreements between Carvel and its various suppliers of ice cream mix, cones, and paper products are violative of the antitrust laws insofar as they obligate the suppliers not to deal directly with the individual dealers but solely with Carvel and not to sell to the dealers any merchandise other than that approved by Carvel. We disagree.

With regard to Carvel's contracts with Hood and Rakestraw, which produced Carvel ice cream mix in accordance with a secret formula which they pledged not to divulge, it seems perfectly clear that as the possessor of a secret formula for its ice cream mix Carvel enjoyed the right to sell it to whomever it chose, and this right was not diluted by its agreement with Hood and Rakestraw to produce the mix. Carvel was free to insist that Hood and Rakestraw produce the mix solely for Carvel and subject to Carvel's wishes as to its disposition.

As for the provision in the contracts between Carvel and Hood, Rakestraw, Eagle, a cone manufacturer, and Mohawk, a manufacturer of paper products, that the suppliers would not sell non-Carvel products to the individual dealers, we find no merit in the plaintiffs' claims. Carvel cannot be considered in competition with these suppliers from whom it purchases Carvel supplies, and such an agreement not to deal, even if established, when effected by non-competing enterprises is not illegal. See, e. g., Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). Moreover, the plaintiffs failed to prove that they were foreclosed from alternate sources of supply or indeed that the supplier defend-

ants themselves had been requested to make sales to the dealers and had refused.

Accordingly, the judgments of the district court are affirmed.

FRIENDLY, Circuit Judge, with whom MEDINA, Circuit Judge, joins.

Concurring with most of Chief Judge Lumbard's opinion, Judge Medina and I do not consider that a remand as to the claim with respect to the "tied" purchases of flavoring, toppings and cones is either required or warranted in the light of the pre-trial order to which plaintiffs agreed.

The relevant portion of this order is as follows:

"4. That plaintiffs agree that they are relying solely upon alleged *per se* violations of the antitrust laws and make no claim other than that their evidence will establish *per se* violations of the antitrust laws.

"5. Plaintiffs' evidence at the trial on the issue of liability will be limited to (a) written agreements entered into between the Carvel defendants and the plaintiffs, and other documents supplementary thereto or explanatory thereof, (b) written agreements between the Carvel defendants and the supplier defendants, and other documents supplementary thereto and explanatory thereof, and (c) testimony heretofore taken of a Mr. Vettel and a Mr. Bittner."

It could hardly be plainer that plaintiffs were confining themselves to claims of violation of the antitrust laws which, as they thought, could be sustained without other market data than the meagre amount contained in the documents offered.

■■■■■■ In agreeing to the pre-trial order, plaintiffs may have been relying on the inclusion of tying arrangements in the list of *per se* violations in North-

ern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514 (1958). But, as that opinion makes clear, not every tying arrangement is illegal *per se*. Tying arrangements "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." 356 U.S. at 6, 78 S.Ct. at 518. See also Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 608–609, 73 S.Ct. 872 (1953). More recently the Court has said that tying arrangements "may fall" in the category of *per se* violations, "though not necessarily so." White Motor Co. v. United States, 372 U.S. 253, 262, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

■■■■■ Here the facts to which plaintiffs were limited by the pre-trial order showed neither that Carvel had "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product" nor that "a not insubstantial amount of commerce is affected." Indeed, such figures as exist would prove the contrary. In 1960 there were in New York, Connecticut and Massachusetts, 250 Carvel dealers out of a total of 125,000 outlets where ice cream cones could be purchased—amounting to one fifth of one per cent of the outlets and apparently doing about one per cent of the business.[1] The other large Carvel states are New Jersey and Pennsylvania; the balance of a 1960 total of 400 Carvel dealers were scattered at one time over as many as 8 or 9 states from Maine to Florida and as far west as Wisconsin. These dealers competed not only with similar chains—Dairy Queen, Tastee Freez, Dari-Delite, King Kone, Dari-Isle, and others, but also with chains and independents utilizing mobile units, with chain stores and operations such as Howard Johnson, and with the ubiquitous

---

[1]. The Carvel sales of Eagle Cone, which supplies all the cones for Massachusetts, Connecticut and New York, averaged $115,000 per year—about 1% of the total sales of cones in the three states.

corner drug-store. Although Carvel's aggregate sales are "not insubstantial," the totals shed no light on the amount of the "tied" sales here complained of, which common sense tells us must be a minor part.[2] The figures in footnotes 1 and 2 give some indication of the "insubstantiality" of the commerce affected even under the rather narrow test indicated by dictum in Brown Shoe Co. v. United States, 370 U.S. 294, 330, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), especially with reference to the cones, whose tie-in was hardest to justify in terms of quality control. Not only was the amount of commerce in these not consequential, but any damage to the plaintiffs was even less so. Eagle Cone's billings to Carvel averaged $460 per dealer per year, and Carvel's mark-up was slightly over 5% or about $25 per dealer;[3] whether the dealers suffered even that much damage is questionable since the price Carvel charged them was less than they could have obtained if they bought in smaller quantities than Carvel, see fn. 7 to Chief Judge Lumbard's opinion. And, of course, it remained open to competing suppliers to bid for the Carvel business by soliciting that company—in itself an important contrast with cases where the tied item is produced by the seller.

Our brother Lumbard thinks the first of the deficiencies in proof as to economic power was remedied by Carvel's license of a package of trade-marks, design patents relating to the shape of the building etc., and a patented freezing and dispensing machine. We cannot agree. In the first place, the patented items cannot realistically be considered the "tying product" or the focus of the arrangement. Whatever has been said about the evils of "ties" to patented or copyrighted items is meaningful only in

the situation where the desirability of the patented item is what motivates the purchaser to make further commitments or to give up some liberty of choice as to other products. See, e. g., United States v. Loew's Inc., 371 U.S. 38, 45, 83 S.Ct. 97 (1962). In this case, the patented items appear to have been virtually without motivating significance in bringing about the agreement. The true tying item was rather the Carvel trademark, whose growing repute was intended to help the little band of Carvel dealers swim a bit faster than their numerous rivals up the highly competitive stream. There may, of course, be cases where a trade-mark has acquired such prominence that the coupling of some further item to its license would constitute a per se violation; but such a trademark would satisfy the market dominance test of Times-Picayune and Northern Pacific. The figures show that Carvel is not such a mark.

Tying arrangements differ from other per se violations, such as price-fixing, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), in that they can be justified on occasion, as by proof that "the protection of goodwill may necessitate" their use "where specifications for a substitute would be so detailed that they could not practicably be supplied," Standard Oil Co. of Calif. and Standard Stations v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058 (1949). Since the value of a trade-mark depends solely on the public image it conveys, its holder must exercise controls to assure himself that the mark is not shown in a derogatory light. The record affords no sufficient basis for upsetting the finding of the District Judge that "To require Carvel to limit itself to advance specifica-

2. There are figures which indicate that 1960 sales of all "ingredients" other than mix to all dealers amounted to $1,354,599 —or an average of less than $3,400 per dealer per year; the record does not make it clear whether all these "ingredients" were tied. Two-thirds of the figure of $3,965,923 in Chief Judge Lumbard's opinion constitute sales of the Car-

vel secret formula mix which surely could legally be tied to the Carvel trademark if that mark was to retain its significance, as he concedes.

3. There was evidence that one of the plaintiffs had purchased $621 worth of cones in the big year, 1959; Carvel's mark-up on these would have been around $30.

tions of standards for all the various types of accessory products used in connection with the mix would impose an impractical and unreasonable burden of formulation * * *" Although instances of impossibility of control through specification may indeed be rare in cases involving the proper functioning of mechanical elements of a machine, see International Business Machines Corp. v. United States, 298 U.S. 131, 139, 56 S.Ct. 701 (1936); International Salt Co. v. United States, 332 U.S. 392, 397–398, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Turner, The Validity of Tying Arrangements under the Antitrust Laws, 72 Harv.L.Rev. 50 (1958); but see Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653 (1 Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), such cases are scarcely relevant to the problem of controlling something so insusceptible of precise verbalization as the desired texture and taste of an ice cream cone or sundae; that Carvel was able to specify this to its source of supply, whose product it regularly checked, does not show that administration could be confided to 400 dealers. Furthermore in most states Carvel would risk liability to anyone injured by a foreign substance in the frozen mix, see ALI, Restatement (Second), Torts 402A (Tent. Draft No. 7, 1962); although it might not be so with respect to ingredients purchased from suppliers of the dealer's own choosing, the difficulties of proof are such that it is entitled to insist on products in which it has complete confidence. Vettel's testimony that the success of the enterprise required distinctive flavorings of uniform quality and that he considered it impracticable to handle the problem by specification and policing was sufficiently reasonable and persuasive that the judge was entitled to credit it, whether or not one of us would agree.[4] We see little force in the fact that a competitor, which licenses only freezing machines and the trade-mark and does not sell a mix made by a secret formula, is satisfied with less exacting provisions. See Engbrecht v. Dairy Queen Co., 203 F.Supp. 714 (D. Kan.1962). Moreover, as Vettel also explained, by packing the flavoring in tins or bags that contain exactly the amount required for a 10-gallon can of mix, Carvel encouraged the dealers to use an adequate quantity and provided an automatic control. Finally there is a limit to the amount of inspecting feasible when each dealer purchases an average of less than $12,000 a year of Carvel products (including equipment) and sells in 10¢ and 20¢ units.

█ Even were we to consider the patented machines and design patents to be a relevant part of the tying arrangement, the Northern Pacific opinion ruled out the idea, thought by some to have been implicit in earlier opinions, that proof of the license of a patented device sufficed *semper et ubique* to show the market dominance required to render a tying arrangement a *per se* violation.[5] In doing so it appropriately recognized the facts of business life. The society of patents is not egalitarian. As had been well said three years earlier, although with some dissent, in the Report of the Attorney General's Committee to Study the Antitrust Laws (1955), 238:

"The patent may be broad and basic, in which event the economic power incident to the patent makes the tying clause illegal. On the other

---

4. Vettel testified that one of the specifications to the manufacturer was that certain fruits be purchased at crop site; we are at a loss to understand how this could be policed by inspection on the dealer's premises.

5. "In arriving at its decision in International Salt the Court placed no reliance on the fact that a patent was involved nor did it give the slightest intimation that the outcome would have been any different if that had not been the case. If anything, the Court held the challenged tying arrangements unlawful *despite* the fact that the tying item was patented, not because of it." 356 U.S. at 9, 78 S.Ct. at 520.

hand, the patent may be narrow and unimportant, in which event it may confer virtually no real market power. Accordingly, where the tying product is patented, the patentee should be permitted to show that in the entire factual setting, including the scope of the patent in relation to other patented or unpatented products, the patent does not create the market power requisite to illegality of the tying clause."

Indeed, the statement in Northern Pacific had been anticipated by the remark in Standard Oil Co. of Calif. and Standard Stations v. United States, supra, 337 U.S. at 307, 69 S.Ct. 1051, that a patent is *"prima facie* evidence" of market control—evidence which was clearly rebutted here. Although there is lanaguage in United States v. Loew's Inc., supra, 371 U.S. at 44–48, 83 S.Ct. 97, which lends support to a theory that the mere existence of a patent of any description is not merely *prima facie* but irrebutable evidence of market control, we find it hard to believe that the Court would thus have obliquely reversed the position taken in Northern Pacific, a position underscored by Mr. Justice Harlan's remarks in dissent, 356 U.S. at 17–19, 78 S.Ct. 514; the language rather must be read in the context of the Court's previous proscription of block-booking of motion picture films in United States v. Paramount Pictures, Inc., 334 U.S. 131, 156–159, 68 S. Ct. 915, 92 L.Ed. 1260 (1948), see 371 U. S. at 48, 83 S.Ct. 97. There is scant analogy between unique "hit" movies, or the tabulating and computing machines in International Business Machines Corp. v. United States, supra, as to which the defendant had but one smaller competitor, or the salt-processing machines in International Salt Co. v. United States, 332 U. S. 392, 68 S.Ct. 12 (1947), and Carvel's dispensing machine by which, along with the rest of its package of distinctive devices, it had gained only 1% of the ice cream cone market in the area of its heaviest concentration, see fn. 1.

The triviality of whatever financial hardships the plaintiffs may have suffered as a result of these allegedly illegal contracts explains why they were willing to limit themselves to *per se* violations rather than incur the expense of assembling market data to gain what at best would be a negligible recovery. They have had two trials, one in which they were defeated in their claim of fraud, with a transcript of nearly 4,000 pages; we see no sufficient reason to order a third.