**DETROIT CITY DAIRY, INC., a Michigan Corporation, Plaintiff,**

v.

**KOWALSKI SAUSAGE CO., INC., a Michigan Corporation, Defendant.**

Civ. A. No. 37895.

United States District Court,
E. D. Michigan, S. D.

March 19, 1975.

Barris, Sott, Denn & Driker, By Eugene Driker and Michael T. McLoughlin, Detroit, Mich., for plaintiff.

Cross, Wrock, Miller & Vieson, By W. Robert Chandler & Andrew A. Paterson, Jr., Detroit, Mich., for defendant.

## OPINION

RALPH M. FREEMAN, District Judge.

The plaintiff, Detroit City Dairy, Inc. (DCD), commenced this suit against the Kowalski Sausage Company, Inc. (Kowalski) contending that Kowalski had violated § 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and § 3 of the Clayton Antitrust Act (15 U.S.C. § 14) by engaging in an illegal tying arrangement with certain of its retailers. The issue of liability was tried before the court sitting without a jury.

Both parties are Michigan corporations with their principal places of business in Wayne County, Michigan. DCD is a wholesale distributor of dairy, meat and other food products. It sells these products to retail outlets, including food store chains, individually owned food stores, party and specialty food shops, restaurants, schools, institutions and government bodies. Kowalski is a manufacturer of meat products; chiefly various types of sausage that it sells to retail customers and to retail outlets. It also sells some food products not manu-factured by it. These nonmanufactured food products are referred to as "resale items."

This lawsuit centers around certain of the resale items sold by Kowalski which are also sold by DCD; Polish ham, hard salami, and fancy cheese. It should be noted that the *identical* product is sold by both.

There are some retail outlets to which both Kowalski and DCD attempt to sell the hams, salami and cheese. This case is concerned with approximately 102 of these outlets. All of these stores are small, family owned, neighborhood stores. They all sell a high volume of Kowalski manufactured products. Kowalski maintains a separate list of these stores and variously refers to them as "volume accounts," "franchise stores," "AA stores," and "authorized" stores. There is no written agreement between Kowalski and these stores.

Another characteristic common to these AA stores is that they have been provided with a neon sign by Kowalski. The sign carries the Kowalski name and trademark. The sign itself is worth about $75 but it is given to the stores by Kowalski. Some of the stores also have painted signs of the same nature, which signs are painted and maintained by Kowalski without charge.

DCD contends that Kowalski has violated the Sherman and Clayton Antitrust Acts by tying the sale of Kowalski manufactured products, as well as the ability of the buyer to keep his neon sign and his franchise status, to the sale of Polish hams, hard salami and fancy cheese. Kowalski contends that there has been no illegal tying arrangement; that at most Kowalski entered into exclusive dealing arrangements; and that there is no jurisdiction under the Sherman and Clayton Acts.

§ 1 of the Sherman Act provides, in pertinent part, that "(e)very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is declared to be illegal." § 3 of the Clayton Act provides in pertinent part as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

The first issue which must be resolved by the court is whether or not a tying arrangement exists. Only if this is answered in the affirmative need the court examine the question of whether the elements of an *illegal* tying arrangement under the Sherman and/or Clayton Acts are present.

## EXISTENCE OF TYING ARRANGEMENT

In Northern Pacific Railway Co. v. United States, 356 U.S. 1, at p. 5, 78 S.Ct. 514, at p. 518, 2 L.Ed.2d 545 (1958), the Supreme Court defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." This definition has been quoted in many subsequent cases and appears to remain the standard definition. With respect to this definition, there is no need to differentiate between the Sher-

man and Clayton Acts. The definition of a tying arrangement is the same for both. It is only when a tying arrangement has been established and the court must determine whether the arrangement is illegal that the differences between the two acts become important.

One of the elements essential to the existence of a tying arrangement is the presence of an agreement between the seller and the purchaser. In McElhenney v. Western Auto Supply, 269 F.2d 332 (4th Cir. 1959), the court recognized that generally, absent conspiracy or monopolization, a seller may refuse to deal with a customer for any reason, or no reason at all. Thus it would not be enough to establish a tying arrangement to demonstrate that a seller refused to deal with anyone who did not buy certain of its products. However, the *McElhenney* court went on to state that

(t)his is not to say . . . that the course of dealing between seller and buyer may not go beyond mere customer selection and the independent announcement of policy and ripen into an implied or informal agreement or understanding. But whether there is such agreement is always a question of fact to be determined in light of all the circumstances . . . (269 F.2d at 337)

Of course, if such an agreement is found, in order to be actionable it must violate some provision of the antitrust laws. But the existence of an agreement was considered crucial:

Neither in terms nor inferentially does the statute prohibit a unilateral refusal to sell. Its condemnations are directed against executed transactions of lease, sale or contract containing the forbidden condition, agreement or understanding. Quite correctly the District Court pointed out that a mere refusal by a manufacturer to deal with a retailer who will not confine his dealings to the goods of the manufacturer does not run afoul of the sections. . . . (269 F.2d at 337, 338)

However, the agreement could be implied from a course of dealing between the parties: "Probably nothing is more firmly settled in our antitrust jurisprudence than that an illegal contract may be inferred from all of the circumstances." (269 F.2d at 338). See also Osborn v. Sinclair Refining Co., 286 F. 2d 832 (4th Cir. 1960)

Another essential element in any conclusion that a tying arrangement exists is the identification of two distinct products—the tying product and the tied product. In the case at bar, DCD contends that Polish hams, hard salami and cheese products are the tied products, and that, taken together, the Kowalski manufactured products, the Kowalski neon sign and the Kowalski franchise status are the tying product. Kowalski contends that no tying product has been shown as (1) there is no evidence that the manufactured meat products were tied to the hard salami, Polish ham or cheeses; (2) neither the Kowalski name or trademark are capable of being tying products; and (3) the Kowalski sign has not been shown to be a tying product and that regardless of this lack of evidence, the sign is not capable of being a tying product.

█ Putting aside for the moment the contention that the Kowalski manufactured products were used as a tying product, the plaintiff also contends that the Kowalski neon sign and franchise status were used as a tying product. Because the sign carries the Kowalski trademark, the issue of a trademark as a tying product has also been raised. In practical terms, the trademark and franchise status are part of the same product: the sign. As noted, aside from its intrinsic value of $75, the sign really is the trademark. And from the record, the sign appears to be the only benefit conferred by Kowalski on its "franchise" dealers. There is no indication that the AA outlets receive different products, better prices, or better credit than Kowalski's other customers. In sum, in determining whether a tying arrangement exists, the court need only look to the Kowalski manufactured products and the Kowalski sign as possible tying products—keeping in mind that the sign also symbolizes the trademark and the "franchise" status. In fact, the sign is important, if at all, not because it is worth $75, but because it carries the Kowalski trademark and evidences the franchise status.

The question then arises as to whether the sign, and all that it implies, *can* be a separate product capable of being a tying product. Of course, there is no question but that the Kowalski manufactured products can be a tying product. There have also been cases which have found that a trademark can be a distinct tying product. Kowalski argues that these cases are factually distinguishable from the case at bar. While the arrangements between the seller and buyer in those cases may be different from whatever arrangements exist in the case at bar, the discussion in these cases, as well as their holdings, are relevant.

One such case is that of Susser v. Carvel Corporation, 332 F.2d 505 (2nd Cir. 1964). The facts of this case indicate that each Carvel franchise store was identical in design, "each featuring the Carvel crown and cone trademark on a flat slanting roof, glass walls on its front, and the name 'Carvel' on its side in neon lights." (332 F.2d at 509) This design was patented. Although the panel which decided this case was split as to whether or not an *illegal* tying arrangement existed, the court was unanimous in its conclusion that the trademark involved was the tying product. This case is important because it was one of the first, if not *the* first, to decide that a trademark could be a tying product.

Siegel v. Chicken Delight, 448 F.2d 43 (9th Cir. 1971) cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232, is another case in which a trademark was found to be a tying product. The challenged arrangement was an agreement whereby the Chicken Delight franchisees

agreed to purchase certain equipment, food items and trademark bearing packages exclusively from Chicken Delight as a condition of obtaining a trademark license. This arrangement was apparently in lieu of the payment of royalties or franchise fees.

The defendant contended that the trademark and franchise license could not be tying products because they were inseparable from the other items which were essential components of the franchise system. The court disagreed with this contention and cited the *Carvel* case for the proposition that a trademark or franchise license could be regarded as a distinct tying product. It made the following observations:

In determining whether an aggregation of separable items should be regarded as one or more items for the tie-in purposes in the normal cases of sales of products the courts must look to the function of the aggregation. Consideration is given to such questions as whether the amalgamation of products resulted in cost savings apart from those reductions in sales expenses and the like normally attendant upon any tie-in, and whether the items are normally sold or used as a unit with fixed proportions. (Footnotes omitted.)

When one of the products sold as part of an aggregation is a trade-mark or franchise license, new questions are injected. In determining whether the license and the remaining ("tied") items in the aggregation are to be regarded as distinct items which can be traded in distinct markets consideration must be given to the function of trade-marks. (448 F.2d at 48)

The court held that the historical conception of a trademark as an emblem of a product has largely been abandoned for the rationale of trademarks as representations of product quality. With the type of franchise involved in the case, the court stated,

. . . the trade-mark simply reflects the goodwill and quality stand-

ards of the enterprise which it identifies. . . .

It is to the system and the end product that the public looks with confidence that established goodwill has created.

Thus, sale of a franchise license, with the attendant rights to operate a business in the prescribed manner and to benefit from the goodwill of the trade name, in no way requires the forced sale by the franchisor of some or all of the component articles. . . .

The relevant question is not whether the items are essential to the franchise, but whether it is essential to the franchise that the items be purchased from Chicken Delight. This raises not the issue of whether there is a tie-in but rather the issue of whether the tie-in is justifiable . . . (448 F.2d at 49)

In Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th Cir. 1972), the Fifth Circuit joined the Second and Ninth in holding that a trademark could be a tying product.

Two other cases which have discussed the use of a trademark as a tying product are Refrigeration Engineering Corporation v. Frick Company, 370 F.Supp. 702 (W.D.Tex.1974) and Mid-America ICEE, Inc. v. John E. Mitchell Co., 1973–2 Trade Cases 94,982 (E.Or. 1973). In the *Frick* case, the plaintiff contended that the defendant's trademark was a tying product. The court disagreed that a tying arrangement existed, but went on to discuss the use of a trademark as a tying product:

Plaintiff's contention that a Frick *trademark* is a tying product suffers from the same absence of proof that Frick at any time required the purchase by RECO of any of its products as a condition for permitting any claimed purchase of a trademark. Further, the Frick trademark is not separate from or sold separately from the Frick products, but is clearly identified with and an integral part of

such products; . . . While lower courts have, in some recent cases, held that a trademark may be a separate product to which another product may be tied, these cases make it clear that only certain specific trademarks, of the "representation of product quality" type, may be separate products and therefore be involved in tying. Such trademarks are in fact separately marketable, and are sold by "rent-a-name" type franchisors. They are not simply "representation of product origin" type trademarks, which are not sold separately. The distinction is clearly set forth in Mid-America ICEE, Inc. v. John E. Mitchell, Co., 1973–2 Trade Cases, ¶ 74,681 (D.Or. 1973). (370 F.Supp. at 711)

In the *Mid-America ICEE* case, one of the contentions of the plaintiff was that the defendant was illegally tying the ICEE machine to the ICEE trademark. That machine was manufactured by the defendant and it dispensed a particular kind of drink. The court stated that there was no doubt that in some circumstances a trademark could be a tying product. However, it noted that the problem of finding separate products was formidable in such a case because a trademark is "first, and usually the name of something else." The question confronted by the court was "when does that name acquire sufficient substance in its own right that it should be distinguished from the objects for which it serves as name." In discussing this problem, the court made the following remarks:

> The ICEE trademark had its own value as a result of prior advertising and name familiarity, whether this value is called goodwill or something else. The public probably associated the name more with a particular kind of drink than with machines produced by Mitchell. Perhaps the public would not have noticed if Mitchell had permitted the trademark to be applied to the product of competing machines, and to that extent the trademark was

separable from the machine. Certainly some of the subdevelopers wanted the one without the other . . . (1973–2 Trade Cases at 94,986)

However, even given this, the court held that the ICEE trademark was not a tying product. This holding was based on the fact that the defendant's business had not been the sale of trademarks or franchises and that the defendant's interpretation of the use of its trademark was one of "representation of product origin" rather than "representation of product quality." The court stated that this "reasonable interpretation should not be disturbed because others perceive that the trademark and machine could be separated at a profit to them, if not perhaps to Mitchell." (1973–2 Trade Cases at 94,987).

The *ICEE* case is easily distinguishable from the case at bar. In that case, the trademark was actually attached to the machine manufactured and distributed by the defendant. Thus, even though others might believe that the trademark could be separated from the machine and perhaps attached to another manufacturer's machine which dispensed the drink with which the public identified the trademark, the defendant did not think of its trademark in this light. However, in the case at bar, the plaintiff does not contend that it was a tie-in to condition receipt of the Kowalski trademark on the purchase of *Kowalski* manufactured products, *to which the trademark was affixed.* For one thing, the trademark in question is found on a tangible object which is physically separate from the Kowalski product. Moreover, the plaintiff contends that receipt of the sign (trademark) was conditioned on the purchase of products *not manufactured by Kowalski:* products to which the trademark could not be considered as a symbol of origin.

■ This court believes that the Kowalski sign carrying the Kowalski trademark can be used as a tying product when it is used to tie products which are not manufactured by Kowalski. The

president of Kowalski testified that the signs are supplied to those retailers who carry a representative line of Kowalski products. It is certainly not essential to any legitimate purpose of Kowalski in supplying these signs that the retailer purchase the "resale" products from Kowalski. Furthermore, the trademark embodied on the sign cannot be said to be a representation of product origin, at least as to those products not even manufactured by Kowalski. It seems to the court that the same trademark can be used in a variety of ways. The Kowalski trademark found on the outer wrapping of a Kowalski product is a representation of product origin. But when the same trademark is placed on a neon sign which is displayed outside of an independent retail establishment, the trademark is not necessarily being used as a representation of product origin; especially is this true when the sign is being used as leverage to force the retailer to buy products from Kowalski which are not manufactured by Kowalski.

The sign can also be viewed as a separate product in the sense that it is a *sign*, not merely the Kowalski trademark. Not every retailer who purchases Kowalski products receives a sign. It can thus be regarded as a product which is traded in a distinct market. While the retailer does not directly purchase the sign, he purchases it in the sense that in order to receive it, he must at least carry a high volume of Kowalski goods.

Having concluded that the sign and the manufactured products *can* be tying products, the court must determine whether or not they were so used: does a tying arrangement exist?

■ Most of the witnesses produced at trial were employees of the defendant or plaintiff, or were owners of the so-called "franchise" establishments which displayed the Kowalski neon sign. The evidence shows that some of these retail establishments are economically dependent on the Kowalski manufactured products. One witness testified that if he lost the Kowalski products he would go out of business. Another testified that he would have to fire 4 of his 6 employees if he did not have the Kowalski products. One of the concerns of some witnesses who bought an already established store was the presence of the Kowalski products in the store. There is also testimony that one witness told counsel for plaintiff that if he were called to testify he would "lie like hell." Another refused to accept a subpoena to testify. And when a third received a subpoena from the plaintiff, he requested that he instead be subpoenaed by the defendant. The court has kept this in mind in weighing the evidence and determining the credibility of witnesses.

It should also be noted that the testimony of one of the witnesses, Edward Gulick, was not at all credible. He was frequently impeached by his deposition testimony. After being confronted with the inconsistencies, he would more or less adopt that testimony and frequently alter his trial testimony to conform to the deposition. Whenever there has been a conflict between his trial testimony and his adopted deposition testimony, the court has believed the deposition testimony.

Much of the most damaging testimony produced by the plaintiff was that of Mr. Gulick who referred to himself as a sales manager for Kowalski. He had responsibility for all of the Detroit area "driver-salesmen." The driver-salesmen had certain routes. Within these routes they solicited orders for products sold by Kowalski and delivered these products to the customers. The driver-salesmen would report to Mr. Gulick.

Mr. Gulick testified that there was an agreement or understanding between the franchise stores and Kowalski that if they wanted a sign they would have to carry all of the products that Kowalski offered. There is also testimony that when this agreement was not being fulfilled, Mr. Gulick threatened, either overtly or subtly, to remove the sign. Because Mr. Gulick's testimony was so

damaging, it would be worthwhile to quote some of it.

Question: Of these Kowalski franchise stores, is there a specific list of all the items that the store has to carry in order to be designated a franchise store?

Answer: You will have to go back to the original agreement which was agreed to by the party when they first were going into business. When they want to handle all of our products, they ask for a window sign, and I explain to them that if they want to carry all of our products, they can be supplied with a window sign, but we expect them to buy all of our products.

(Tr. 119)

\* \* \* \* \* \*

Question: Then if the man says, "Well, Mr. Gulick, what do you mean by 'all'? do you have something that you show them?

Answer: We show them a sheet, an order sheet, and we spell out what we have. Then they ask, "What item do you have?" Well, we specifically spell out the items, kielbasa, the meat loaves, the liver, the salami, the chopped hams, the pork loins, the cheeses. We have enough products where we can supply the entire needs of the store.

Question: Would that include both the things that carry the Kowalski name and the items that you buy from other people? Is that correct?

Answer: It covers all the items, yes.
(Tr. 121–122)

\* \* \* \* \* \*

Question: Are these Polish hams one of the items that a franchise store must carry in order to be a franchise store?

Answer: It is one of the items that we resell and one of the items that we have available. If they have a

neon sign, we expect them to buy it from us.

(Tr. 122–123)

\* \* \* \* \* \*

Question: . . . Isn't it a fact that when you start out a new franchise store and you put a Kowalski sign in the window, you tell them that if they want to keep that sign in the window, they have to buy all the products you sell, whether you make them or whether you resell them?

Answer: I didn't say they had to, no.

Question: You had an agreement with them to that effect, or a mutual understanding?

Answer: They agreed to buy everything that we had available.
(Tr. 124–125)

Mr. Gulick was then questioned about the action he took when he was informed that a particular franchise store was not buying hams from Kowalski. One of these stores was the Ferndale Delicatessen, owned by Harry Ribiat. Mr. Gulick testified that after learning that Ribiat was not buying hams he went to the store to talk to Ribiat. There is also testimony that when Ronald Kowalski, the president of the defendant, heard about stores that were not buying hams, he directed Mr. Gulick to go out to the stores to determine the reason. When Mr. Gulick arrived at the Ferndale Delicatessen, Ribiat was not there as he was recuperating from a heart attack. Mr. Gulick then called him at home. The testimony concerning this matter is full of contradictions. But the court finds that when Mr. Gulick called Mr. Ribiat at home, he "reminded" him that Ribiat had a neon sign and that he was expected to purchase his hams from Kowalski. Mr. Gulick's testimony also indicates that Gulick believed that when Ribiat bought the store he was informed of the original agreement with Kowalski that he was expected to buy everything from Kowalski.

Question: And when you talked to Mr. Ribiat when he was home that afternoon or that late morning recovering from his heart attack, you reminded him about that original agreement, didn't you?

\* \* \* \* \* \*

Answer: Yes.
(Tr. 138–139)

This testimony concerning Mr. Ribiat is substantiated by the testimony of Mr. Ribiat himself. When asked about the phone conversation he had with Mr. Gulick, he testified as follows:

Answer: He said to me: 'Harry,' he says, 'we must have a little more business from you in canned goods, hard salami and other things.'

I said, 'I'll tell you what. When your price comes down to City Dairy's price, I'll be glad to buy it,' which I would. I would just as soon have one salesman than have two of them come into my store.

He said, 'Well, I'll tell you, we give you two signs outside and give you a neon sign inside. We advertise for you and we are entitled to get a little more.'

So I don't know what was said after that, but I had a hell of an argument with him.
(Tr. 351)

Mr. Gulick was also informed that Stella's Delicatessen was not purchasing hams. He went out to the store and inquired why the owner was not buying hams:

Question: The question then, Mr. Gulick, was when you went out to meet Mr. Cocuzza, was he aware of the franchise agreement between himself and Kowalski Sausage Company?

Answer: Yes, I think he was.

Question: He was aware of it. Did you remind him of this when you talked to him?

Answer: I don't remember exactly—the exact explanation at that time.

Question: Well, in substance you told him, didn't you, at that meeting that you expected him to buy everything that he needed from Kowalski Sausage Company.

Answer: I expected him to, yes.

Question: And you told him that didn't you, at that meeting?

Answer: At that meeting.

Question: The answer is yes?

Answer: Yes.
(Tr. 154–155)

The testimony indicates that similar meetings were had with the owners of other franchise stores who were not buying hams from Kowalski.

The import of Mr. Gulick's testimony is substantiated by other evidence. John Cocuzza, the owner of Stella's Delicatessen at the time in question, testified that shortly after he bought the store he had a conversation with Mr. Gulick. He testified that Mr. Gulick told him that "the products that were being sold in the store were all coming from Kowalski at that time and I couldn't buy anything from any place else that Kowalski produced themselves." (Tr. 240) Thereafter, he began buying Polish hams from the plaintiff and shortly thereafter he had another discussion with Mr. Gulick.

Question: Did Mr. Gulick call you on the telephone about the purchases of Polish hams?

Answer: Yes, he did. He called me at the restaurant where I am now employed in February of '71 and we had a discussion, and I became very angry with the fact that he said he was going to take down the sign unless I bought hams from Kowalski's.

. . .
(Tr. 242)

There is testimony from several of the plaintiff's salesmen that they attempted to sell hams to Kowalski franchise stores but were often unsuccessful even though the price charged by City Dairy for the identical product might be ten to fifteen cents cheaper per pound. There is also

testimony that such a price differential is very significant to a retailer.

One of the plaintiff's truck drivers testified about an incident that occurred when he attempted to deliver an order to one of the Kowalski franchise stores. He testified that he entered the store with an order just as a man from Kowalski was leaving. The owner of the store stopped him.

Question: Did he have anything in his hand?

Answer: He had a meat cleaver.

Question: Did he get excited?

Answer: That's an understatement.

Question: Did he start swearing at you?

Answer: Yes, sir.

Question: Did he use some very strong language with you?

Answer: Yes, sir.

Question: You knew [the owner] from before, did you not?

Answer: Yes, sir.

Question: Had he ever sworn at you or used strong language with you before?

Answer: No, sir.
(Tr. 280–281)

After some further heated conversation with the owner of the store, the truck driver left. Later in the day he went back to the store and delivered the merchandise without incident. No one from Kowalski was around at that time.

One witness testified that when he was given the sign he was asked by Mr. Gulick to agree to purchase all that Kowalski offered from Kowalski but that he would not so agree. This was the witness who was first subpoenaed by the plaintiff but requested that the defendant subpoena him instead.

Finally, Mr. Must, the president of Detroit City Dairy testified about a conversation which he had with Stephen Kowalski, the chairman of the board of the Kowalski Sausage Company. The conversation took place after Mr. Must was told about the problems his employees were having in selling products to Kowalski franchise stores:

Question: What did you tell Mr. Kowalski?

Answer: After talking for a few minutes about the time of day, I asked him if he was aware of the fact that some of his people were giving orders out there of not purchasing products through our company. . . . Yes, he said, he was aware of it. And I asked him what he was going to do about it, and more or less he told me he was going to continue. And I made some remark to him about the fact that whether he realized this was restraint of trade. And he says, well, he says, he didn't think so.

. . .

\* \* \* \* \* \*

Question: Did Mr. Kowalski say anything overall about these stores?

Answer: As I recall now, I think he made a remark that the stores had his sign in there and as long as they carried his sign, he was going to see to it that they didn't purchase from any other vendor or any other food distributor.
(Tr. 79–81)

This conversation, as related by Mr. Must, was not contradicted by the defendant. During a portion of the trial, Stephen Kowalski was present in the courtroom, but he was not called to the stand. Nor was there any contention that he was unable to take the stand for any reason.

■■ This court finds that the testimony taken as a whole demonstrates that a tying arrangement existed. The court further finds that the tying product was the Kowalski neon sign and that the tied product was Polish ham. There is no evidence that the defendant tied the purchase of its manufactured products, either separately or as a bundle, to the purchase of its resale products. The evidence that hard salami and cheese were tied products can only be found in

the testimony that the franchise stores were expected to buy *all* that Kowalski had to offer. However, it was the failure of the retailer to buy hams from Kowalski that sent Mr. Gulick into action. The court declines to hold that the hard salami and cheese were tied products.

The evidence established that Kowalski had an agreement with at least some of its franchise stores that in order to receive and keep their neon sign they had to purchase all that Kowalski offered. This agreement was made through Mr. Gulick, Kowalski's representative. Some franchise dealers testified that there was no agreement. One who so testified also stated, however, that he knew he should buy the products from Kowalski.

■ The court finds that a tying arrangement existed regardless of the evidence that some franchise dealers bought the hams from wholesalers other than Kowalski and that Kowalski never removed any sign. In International Salt v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), the Supreme Court found a tying arrangement even though the offensive agreement was not always inserted in a lease or always enforced. And in Northern Pacific Railway v. United States, 356 U.S. 1, 78 S. Ct. 514, 2 L.Ed.2d 545 (1958), a tying arrangement was found regardless of the fact that exceptions to the agreement existed and that the agreement was leniently administered.

In Advance Business Systems & Supply Co. v. SCM Corporation, 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101, the court found a tying arrangement. The defendant had argued that there could be no finding of a tying arrangement because of the district court's own finding that SCM had never actually terminated a customer's lease because of the use of competitors' products. In rejecting this argument, the Fourth Circuit stated as follows:

The fact that an agreement is leniently administered, however, does not

necessarily lessen, and certainly does not eliminate, its restrictive effect on competition. The overhanging threat of enforcement is ever present, and implied agreements, like express contracts, may be "held over the heads of vendees [and] deny defendant's competitors access to the fenced-off market on the same terms as the defendant." (Citing *Northern Pacific* and *International Salt*.) (415 F.2d at 64)

## ELEMENTS OF ILLEGAL TYING ARRANGEMENT

■ Having determined that a tying arrangement existed, the court must now determine whether the tying arrangement violated the Sherman and/or Clayton Antitrust Acts. Under both acts, the gravamen of the tying arrangement is that a seller with economic power with regard to one product can use that power to acquire and/or exercise power over a different product. The courts have said that a tying arrangement generally serves no business purpose, other than the lessening of competition in the tied product by closing off potential markets to other suppliers as well as restraining the buyer from bargaining with other suppliers. Standard Oil v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1948); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); United States v. Loew's Incorporated, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). Thus, when certain elements are present, a tying arrangement is considered illegal *per se* under both the Sherman and Clayton Acts. The plaintiff in the case at bar has relied on a *per se* theory of illegality.

■ A tying arrangement is *per se* illegal under the Sherman Act when (1) the seller has sufficient market (economic) power over the tying product to restrain free competition in the market for the tied product; and (2) where

a "not insubstantial" amount of commerce in the tied product is affected. The arrangement is unreasonable *per se* under the Clayton Act when *either* of the above two elements are present. Although these elements are fairly easy to state, they are not quite as easy to understand and apply to the evidence of a particular case. However, the task before the court is made simpler by the fact that the elements involved in both acts are the same. Under the Sherman Act, both elements are required for a finding of illegality, while under the Clayton Act, the presence of either element suffices. Thus, cases involving a discussion of the elements under either act, are applicable to cases involving one or both acts. Moreover, a finding of a Sherman Act violation necessarily includes a finding of a Clayton Act violation.

### A. Sufficient economic power over tying product.

In the case at bar, the court has concluded that the tying product was the Kowalski neon sign which displayed the Kowalski trademark. Thus, the inquiry as to the first element of the Sherman Act, and a sufficient element of the Clayton Act, is whether Kowalski possessed sufficient economic power over the neon sign to restrain free competition in the market for Polish hams.

 Proof of the requisite economic power is usually inferred from other, more easily proven, facts. Domination of the market in the tying product has been considered sufficient to support the inference that competition in the tied product has been or probably will be lessened by the agreement. United Shoe Machinery Corporation et al v. United States, 258 U.S. 451, 42 S. Ct. 363, 66 L.Ed. 708 (1922); International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); Fashion Originators' Guild of America, Inc. et al v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), and

Standard Fashion Company v. Magrane-Houston Company, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922). Thus, evidence of market dominance is sufficient to support a finding of the requisite economic power. Likewise, when the tying product is either patented or copyrighted, sufficient economic power may be inferred. Standard Oil Company of California et al v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); United States v. Loew's, Incorporated, 371 U.S. 38, 83 S. Ct. 97, 9 L.Ed.2d 11 (1962). The *Loew's* case also added uniqueness or consumer appeal of the tying product to those facts calling for the inference. More recently, when the tying product is a trademark, some courts have inferred the requisite market power. Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971); Warriner Hermetics, Inc. v. Copeland Refrigeration Corporation, 463 F.2d 1002 (5th Cir. 1972).

Because the court has found that the Kowalski sign displaying the Kowalski trademark is the tying product, and not the Kowalski manufactured goods, most of the guidance derived from the case law is necessarily found in the more recent cases. The use of a trademark as a tying product is a fairly recent development in the law and an analysis of economic power over such a tying product does not easily fit into the more traditional tests of economic power. Although the court has carefully reviewed the earlier tie-in cases, for the purposes of discussion the court will start with the case of Fortner Enterprises, Inc. v. United States Steel Corp. (*Fortner I*), 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

In *Fortner I*, the district court had granted summary judgment dismissing the action under § 1 of the Sherman Act on the grounds that the plaintiff had failed to establish the prerequisites of illegality. The Supreme Court disagreed and remanded the case for trial. In discussing the requirement of economic power, the Court reiterated what had

been said in previous cases—that the standard of "sufficient market power" does not require the defendant to have a monopoly or a dominant position throughout the market for the tying product. "Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market." (394 U.S. at 502–503, 89 S.Ct. at 1258) In the *Loew's* case the Court had said that economic power could be inferred from the tying product's desirability or uniqueness. In *Fortner I*, the Court expanded on this principle:

These decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally serve no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidating the tie. Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market . . . Market power is usually stated to be the ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices . . . (T)he proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market. (394 U.S. at 503, 504, 89 S.Ct. at 1259)

In *Fortner I* the tying product was found to be the extension of credit and the tied product was prefabricated homes. There was a statement that competitors of United States Steel sold comparable homes for at least $400 less than U. S. Steel. With this in mind, the Court stated:

Since in a freely competitive situation buyers would not accept a tying arrangement obligating them to buy a tied product at a price higher than the going market rate, this substantial price differential with respect to the tied product (prefabricated houses) in itself may suggest that respondents had some special economic power in the credit market. (394 U.S. at 504, 89 S.Ct. at 1259.

In compliance with the Supreme Court's ruling, the case was sent back to the district court. After evidence was presented to a jury, the district court granted the plaintiff's motion for a directed verdict and denied a similar motion of the defendant. Only the question of damages was submitted to the jury. The defendant appealed. In Fortner Enterprises, Inc. v. United States Steel, (*Fortner II*), 452 F.2d 1095 (6th Cir. 1971), the Sixth Circuit held that neither party was entitled to a directed verdict and remanded the case for a new trial. The basis for the remand was that the issue of economic power was a question for the jury. The court stated that in *Fortner I*, the Supreme Court had not said that the $400 price differential was conclusive on the issue of economic power, but only that the differential "may suggest" or was "not inconsistent with" the possibility of market power. It was for the jury to decide.

Other courts have interpreted *Fortner I* as an expansion of the doctrine of *per se* illegality. See Advance Business Systems & Supply Company v. SCM Corporation, 415 F.2d 55 (4th Cir. 1969); Warriner Hermetics, Inc. v. Copeland Refrigeration Corporation, 463 F.2d 1002 (5th Cir. 1972), and Capital Temporaries, Inc. of Hartford et al v. Olsten Corp., 365 F.Supp. 888 (D.Conn.1973). In *Fortner II* the Sixth Circuit took exception to the interpretation given to *Fortner I* by the Fourth Circuit in the *Advance Business Systems* case.

As noted earlier in this opinion, a trademark was found to be the tying product in Susser v. Carvel Corporation, 332 F.2d 505 (2nd Cir. 1964). However, the panel was split as to whether the elements necessary to show a *per se* violation of the antitrust laws had been established. Chief Judge Lumbard, writing in dissent, thought that the requisite economic power could be inferred from the use of the trademark as the principal feature of the franchise system:

> I can find little reason to distinguish, in determining the legality of an allegedly unlawful tying arrangement, between the economic power generated by a patent or copyright on the one hand and that generated by a trademark on the other. In all three cases, the Congress has granted a statutory monopoly which places in the hands of the owner the right, within the limitations of federal law, to do as he will with the protected product. The value of the patent, copyright or trademark is, of course, directly proportionate to the consumer desirability of the protected product.
>
> (332 F.2d at 513)
>
> \* \* \* \* \* \*
>
> In short, in order to secure the benefits of employing the Carvel name on his retail products, the dealer has been forced to surrender his right to negotiate with suppliers of his own choice on matters such as price, delivery and other aspects of a contract of sale. Where such a surrender may be traced to the economic leverage of the other party, arising from its trademark, the elements of an unlawful tying arrangement have been established.
>
> (332 F.2d at 514)

However, the majority disagreed with this conclusion that an illegal tying arrangement had been shown:

> There may, of course, be cases where a trade-mark has acquired such promi-

nence that the coupling of some further item to its license would constitute a *per se* violation; but such a trademark would satisfy the market dominance test of Times-Picayune and Northern Pacific. The figures show that Carvel is not such a mark.

> (332 F.2d at 519).

This case was decided before the Supreme Court's ruling in *Fortner I*. At least two courts believe that Judge Lumbard's dissent was vindicated by the decision in *Fortner I*. One of these is Capital Temporaries v. Olsten Corp., 365 F.Supp. 888 (D.Conn.1973). The other is Siegel v. Chicken Delight, 448 F.2d 43 (9th Cir. 1971). One of the issues in the *Chicken Delight* case was the existence of economic power. The district court had ruled that the unique trademark in combination with the demonstrated power to impose a tie-in established sufficient market power as a matter of law. The 9th Circuit agreed, citing *Fortner I*:

> It can hardly be denied that the Chicken Delight trademark is distinctive; that it possesses goodwill and public acceptance unique to it and not enjoyed by other fast food chains.
> (448 F.2d at 50)

Again citing *Fortner I,* the court held that the presumption of economic power which was applied to patents and copyrights also could be applied to trademarks since they constituted a barrier against competition. The Ninth Circuit recognized that its holding conflicted with that of the *Carvel* case, but in a footnote stated that the *Carvel* majority thought that the economic power test required a finding of "market dominance" and that this interptation had been rejected in *Fortner I*.

█ There is some disagreement with regard to the scope of the Supreme Court's ruling in *Fortner I*. However, even under the more restrictive interpretation of the Sixth Circuit in *Fortner II*,

the ability to raise prices or impose other burdensome terms is at least a consideration from which the fact finder can infer economic power, even though this factor may not be conclusive.

This court finds that the record discloses the requisite economic power. As the Supreme Court stated in *Fortner I,* "(o)ur tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market."

In determining whether the requisite economic power exists, the court has been primarily concerned with two factors: (1) The actual purchasing practices of the franchise dealers; and (2) The value of the sign and Kowalski trademark to the franchise dealers.

As previously quoted, the Supreme Court made the following observation with regard to purchasing practices:

Since in a freely competitive situation buyers would not accept a tying arrangement obligating them to buy a tied product at a price higher than the going market rate, this substantial price differential with respect to the tied product (prefabricated houses) in itself may suggest that respondents had some special economic power in the credit market.

(394 U.S. at 504, 89 S.Ct. at 1259)

█ The court finds that price is one of the most important considerations of a small retailer in deciding where to purchase a particular product. Furthermore, a price differential of seven to fifteen cents a pound is considered to be substantial by the retailer. Especially is this true with regard to a product such as Polish ham which is a "price sensitive" product. The consumer will not buy when the price is too high. However, the evidence discloses that some of the franchise stores continued to buy hams from Kowalski even though a substantial price differential existed. This is some indication of the requisite economic power.

Moreover, it must be remembered that the tying product in this case is essentially a trademark. As such, it is unique. And the evidence also discloses that the trademark possessed goodwill and public acceptance and that the sign embodying the trademark had considerably more value to the retailer than the $75 value of the sign. Both Ronald Kowalski and Edward Gulick testified that the substantial Kowalski advertising featured the Kowalski name. Furthermore, the testimony discloses that receipt of this sign was considered important by many retailers. Ronald Kowalski testified that usually the retailer requests the sign himself. Mr. Gulick testified as follows:

Question: As part of your sales pitch, for want of a better word, do you seek to sign them up or to have them agree to become a franchise dealer, take the full line and get the sign?

Answer: If they are interested in how they can become a franchise dealer.

Question: Why? What is the advantage?

Answer: The advantage is that we are well known in the market for our products, and if they have a sign they feel that their chances of being a success are much greater than if they opened up a store without any.

(Tr. 127–128)

Ronald Kowalski testified as follows:

Question: What reason, if any, did you have for desiring the dealers who were furnished with the signs to handle a full line of your product?

Answer: So that when the consumer saw the sign and because of our advertising, we had had to point out to the consumer that the availability of Kowalski products was a—well, it wasn't available at all chain stores so she had to make an extra stop, and therefore, that's why we promote the—
(Tr. 458)

One franchise dealer testified that a lot of customers came into his store because he had Kowalski products. Of course, one benefit of the Kowalski neon sign is to alert the consumer that Kowalski products are available inside. Mr. Ribiat testified that the Kowalski name on the meat products was important to him because it was important to his customers. One of Kowalski's salesmen testified that the Kowalski quality and reputation almost sold the Kowalski products themselves.

From the record of this case, the court finds that the goodwill and public acceptance of the Kowalski products extends to the Kowalski trademark. Consumers identify the trademark with a product of quality, not with the fact that a particular outfit manufactured a particular product. Furthermore, this goodwill and public acceptance of the Kowalski trademark is very valuable to a retailer who displays that trademark. And of course, it is only Kowalski who can give the retailer the right to display that trademark.

Keeping this evidence in mind, one final case should be mentioned. In Lessig v. Tidewater Oil Company, 327 F.2d 459 (9th Cir. 1964), the defendant was charged with violating the Sherman and Clayton Acts by an alleged exclusive dealing and tying arrangement with its gasoline dealers whereby they had to purchase their TBA (tires, batteries and automotive accessories) from Tidewater. In discussing whether there was enough evidence of economic power to go to a jury, the court mentioned various factors that could be taken into consideration by the jury:

The consequences of termination were disproportionately grave to the dealer. Tidewater could substitute one dealer for another readily, or operate the station for itself. The dealer was economically bound to his station and to Tidewater's petroleum products; they were to him unique. The good will of his business attached to them; . . .
(327 F.2d at 470)

This court concludes that Kowalski possessed the requisite economic power over the tying product to restrain free competition in the tied product. Furthermore, the court finds that Kowalski exercised this power in attempting to force its franchise dealers to purchase Polish ham from Kowalski. Although the evidence discloses that the tying arrangement was not 100% successful, the court believes that such an arrangement need not be completely successful. As the Supreme Court said in International Salt Co. Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20 (1947), "(u)nder the law, agreements are forbidden which 'tend to create a monopoly,' and it is immaterial that the tendency is a creeping one rather than one that proceeds at full gallop; nor does the law await arrival at the goal before condemning the direction of the movement." (332 U.S. at 396, 68 S. Ct. at 15)

Having found this first element, the court must necessarily conclude that Kowalski's tying arrangement violated § 3 of the Clayton Act. However, in order to conclude that there was also a Sherman Act violation the court must also find that there was a "not insubstantial" amount of commerce in the tied product affected.

*B. "Not insubstantial" amount of commerce affected.*

Generally, the existence of a "not insubstantial" amount of commerce

in the tied product affected by the tying arrangement may be inferred from the amount of business in the tied product attributable to the defendant through the tying arrangement. The Supreme Court made the following observations in *Fortner I*:

> The requirement that a "not insubstantial" amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie, . . . An analysis of market shares might become relevant if it were alleged that an apparently small dollar-volume of business actually represented a substantial part of the sales for which competitors were bidding. But normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie, for as we said in *International Salt*, it is "unreasonable, *per se*, to foreclose competitors from any substantial market" by a tying arrangement, 332 U.S. at 396, 68 S.Ct. [12] at 15 [92 L.Ed. 20].

(394 U.S. at 501, 89 S.Ct. at 1257)

The Court said that a sum of $200,000 a year which was attributed to the plaintiff's own tying arrangement was not insubstantial.

In the case at bar, the tied product was Polish ham. The court's inquiry is thus directed to whether or not a "not insubstantial" amount of commerce in Polish ham was affected.

■ Although the number varied, Kowalski sold products to approximately 600 customers. In 1971, Kowalski *purchased* $507,218.16 worth of Polish ham. Most, if not all of this ham was purchased from out of state distributors. If each of the 600 customers purchased the same amount of Polish ham, and if Kowalski did not mark up the price of

the ham, each customer would have bought approximately $845.36 ($507,218.16 ÷ 600) worth of hams from Kowalski in 1971. Of these 600 customers, 102 are franchise stores. Since the tying arrangement affected only the franchise stores, at least $86,376.72 ($845.36 × 102) worth of hams is attributable to the tying arrangement. The court finds that this is not an insubstantial amount. Furthermore, this figure is necessarily quite inaccurately low. First of all, this sum is based on what Kowalski paid for the hams but Kowalski must have marked up the price of the ham it sold to its customers. Second of all, the evidence discloses that Kowalski did not sell the ham to all of its customers, although the court does not know how many of the 600 customers did buy ham. And finally, the 102 franchise stores were the higher volume customers and it can be assumed that they bought more hams than the average customers, especially since they were subject to a tie-in. Thus, the court believes that the figure of $86,376.72 is very low and that the actual sale of ham subject to the tie-in was probably twice that amount.

The court thus finds that the tying arrangement persent in the case at bar was illegal under both § 1 of the Sherman Act and § 3 of the Clayton Act.

## JURISDICTION

One last issue remains to be resolved, and that is the issue of jurisdiction. Kowalski contends that there is neither Clayton Act nor Sherman Act jurisdiction. Of course, if Kowalski is correct in this contention, judgment must be entered in favor of Kowalski even though the court has found that violations of both acts occurred.

■ The relevance of a seller's connection with interstate commerce with respect to the Sherman and Clayton Acts arises in relation to two issues: The

first, discussed above, is a determination of whether or not a tying arrangement has the "not insubstantial" effect on interstate commerce necessary for finding a violation of the acts. The second issue is whether the arrangement has a sufficient connection with interstate commerce in order to fall within the jurisdiction of the acts. These two issues are somewhat difficult to separate, but it is clear that they are distinct questions. In Rasmussen v. American Dairy Association, 472 F.2d 517 (9th Cir. 1973), cert. denied 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003, a case involving the Sherman Act, the court attempted to make the distinction clear:

> . . . an important distinction should be stressed—the distinction between the jurisdictional question, with which we are concerned, and the question of whether, in other respects, a substantive violation of the Sherman Act is alleged.

> The two problems are frequently confused, and understandably so . . . Section 1 of the Act prohibits contracts, combinations and conspiracies "in restraint of trade or commerce among the several States." This single cryptic phrase defines both the conduct prohibited by the Act and the statute's jurisdictional reach . . .

> Whether a defendant's conduct constitutes a substantive Sherman Act violation is entirely a matter of congressional definition: Is the defendant's conduct the type of conduct Congress intended to prohibit? . . . The jurisdictional question, on the other hand, concerns Congress' power to reach the defendant's conduct: "[T]he restraint must 'occur in or affect commerce between the states . . . for constitutional reasons.' "

(citations omitted) (472 F.2d at 521–522)

The confusion concerning these two issues is frequently found in lower court cases and this fact makes it difficult to separate those cases which are "good law" from those whose holdings are based on a misunderstanding of the proper standards applicable to the jurisdictional issue as opposed to the substantive issue.

The jurisdictional language of the Sherman and Clayton Acts are not the same. The relevant language of § 1 of the Sherman Act provides that certain conduct which is "in restraint of trade or commerce among the several States" is prohibited. The jurisdictional requirement of § 3 of the Clayton Act prohibits certain conduct by "any person engaged in commerce, in the course of such commerce." DCD contends that the distinction between the two is more academic than real. Kowalski contends that the Clayton Act has a stricter standard which requires that there be an interstate sale.

### A. Sherman Act Jurisdiction

Kowalski contends that there is no Sherman Act jurisdiction because of the purely intra-state nature of its business. The evidence discloses that Kowalski *sold* only to customers within the state of Michigan. However, the cases are unanimous that the jurisdictional requirements of the Sherman Act are satisfied when the conduct has occurred in interstate commerce *or* when the conduct *affects* interstate commerce. In Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), the Supreme Court articulated this standard as follows:

> . . . it is well established that an activity which does not itself occur *in* interstate commerce comes within the scope of the Sherman Act if it substantially *affects* interstate commerce. (Emphasis in original) (389 U.S. at 321, 88 S.Ct. at 444)

Some cases have held that jurisdiction under the Sherman Act is co-extensive with congressional power to act under the Commerce Clause. Pevely Dairy v. United States, 178 F.2d 363 (8th Cir.

1949). The opinion in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1947) supports this interpretation.

In the *Mandeville Island Farms* case, the Supreme Court explained the expanded conception of the Commerce Clause and the consequent expansion of Sherman Act jurisdiction. The case concerned the monopolistic practices of California sugar refiners with respect to the farmers who grew sugar beets. All of the alleged conduct occurred within the state of California, although after the beets were refined into sugar, the sugar was sold in interstate commerce. The refiners contended that there was no Sherman Act jurisdiction as the conduct was alleged only to affect intrastate commerce.

The Court characterized the refiners' argument as a revision to the concept of congressional power under the Commerce Clause whch had ultimately been rejected by the *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914).

> With the extension of the *Shreveport* influence to general application, it is necessary no longer to search for some sharp point or line where interstate commerce ends and intrastate commerce begins, in order to decide whether Congress' commands were effective. For the essence of the affectation doctrine was that the exact location of this line made no difference, if the forbidden effects flowed across it to the injury of interstate commerce or to the hindrance or defeat of congressional policy regarding it.

> (334 U.S. at 232, 68 S.Ct. at 1004)

> \*　\*　\*　\*　\*　\*

In view of this evolution, the inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented. For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence. If so, the restraint must fall, and the injuries it inflicts upon others become remediable under the Act's prescribed methods, including the treble damage provision. (334 U.S. at 234, 68 S.Ct. at 1005)

See also United States v. Employing Plasterers Association, 347 U.S. 186 (1954), wherein the Court stated at p. 189, 74 S.Ct. 452, at p. 454, 98 L.Ed. 618, "(t)hat wholly local business restraints can produce the effects condemned by the Sherman Act is no longer open to question," and Burke v. Ford, supra. In Universal Milk Bottle Service v. United States, 188 F.2d 959 (6th Cir. 1951), the Sixth Circuit noted that it is not necessary to establish a "stream of commerce" since economic effect on interstate commerce can suffice. "In such cases the point where interstate commerce ceases is not involved, if in fact interstate commerce is substantially affected." (188 F.2d at 964).

Some courts have interpreted this language as requiring that, for jurisdictional purposes, any effect on interstate commerce must be substantial. However, the language in the *Mandeville Island Farms* case may also be read to mean that once the *jurisdictional* effect is found, the effect must be substantial in order to find a *substantive* violation.

In Marston v. Ann Arbor Property Managers (Management) Ass'n, 302 F. Supp. 1276 (E.D.Mich.1969), aff'd, 6

Cir., 422 F.2d 836, the plaintiffs charged that the defendants had violated § 1 of the Sherman Act by attempting to fix the price level of rental apartments. Judge Kaess found that there was no Sherman Act jurisdiction. Although the defendant might receive materials from interstate commerce in carrying on their apartment rental businesses, the court held that this fact alone did not necessitate the finding that the defendants' challenged conduct had an effect on interstate commerce: "It has frequently been held that the incidental flow of supplies in interstate commerce does not in itself suffice to transform an essentially intrastate activity into an interstate enterprise. * * * Any conspiracy which only indirectly or incidentally affects and restrains interstate commerce is not within the purview of Section 1 of the Sherman Act." (302 F. Supp. at 1279, 1280).

One distinction which is immediately apparent is that the interstate goods in *Marston* were not involved with the challenged conduct, while in the case at bar, the interstate goods were integrally and directly involved with the challenged conduct—they are alleged to be the illegally "tied product."

One caveat which some courts have made with respect to the affectation doctrine is that the test is not whether the conduct affects a business engaged in interstate commerce, but whether it affects the interstate commerce of that business. See Kallen v. Nexus Corp., 353 F.Supp. 33 (N.D.Ill.1973).

■ In reviewing the cases, it appears that although the affectation doctrine is more liberal, some courts prefer to find jurisdiction through a "stream of commerce" analysis rather than through a finding of an effect on interstate commerce. However, it is clear that Sherman Act jurisdiction is broader than the stream of commerce doctrine. In the case at bar, and with regard to the Sherman Act, the court need

not examine whether or not the hams were in the stream of commerce when the illegal activity took place because the court believes that the requisite effect on interstate commerce is present.

The relevant inquiry is whether the Kowalski tying arrangement had, or threatened to have, the requisite effect on interstate commerce. The plaintiff in this case is a wholesaler who purchases a great volume of products from outside the state of Michigan. Looking just to DCD's purchase of Polish hams, the evidence discloses that DCD purchases hams from distributors in the states of Illinois, New York and Michigan. And these distributors necessarily imported the hams from outside the United States as the hams are from Poland. In 1971 DCD purchased $594,071.-00 worth of imported Polish hams and in 1972 it purchased almost double this amount. The evidence discloses that in addition to DCD and Kowalski there are other wholesalers from whom the retailers could purchase Polish ham.

■ The Secretary/Treasurer of Kowalski testified that Kowalski purchased all of its Polish hams from sources outside the state of Michigan. However, there is also testimony from this witness that there was one local distributor. At any rate, most of the hams purchased by Kowalski were from sources out of the state of Michigan. In 1971 Kowalski purchased $507,218.16 worth of Polish hams.

The court believes that just with respect to the purchase of hams, the record discloses the requisite effect or threatened effect on interstate commerce, even though all of Kowalski's sales were intrastate. Every wholesaler who purchases Polish ham from outside the state of Michigan is necessarily engaged in interstate commerce. And any restraint of trade which affects that wholesaler's ability to trade in Polish hams necessarily affects the interstate commerce of that wholesaler. Thus, the

tying arrangement disclosed in the case at bar necessarily had an effect on the interstate commerce of others who attempt to sell Polish ham to the Kowalski franchise dealers. The more successful the tying arrangement became, the greater the potential effect. The evidence clearly establishes that the tying arrangement had an effect on DCD's ability to sell Polish hams to Kowalski franchise dealers. Obviously the less hams DCD can sell, the less it will buy.

The court has previously noted that the commerce effect was substantial enough to constitute an element of a Sherman Act violation. The court also finds that the effect, or threatened effect of this arrangement was substantial enough to fall within the jurisdiction of the Sherman Act. As the Supreme Court said in the *Mandeville Island Farms* case, ". . . given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence." (334 U.S. at 234, 68 S.Ct. at 1005) This court believes that all of the elements of a Sherman Act violation, including jurisdiction, are present in the case at bar.

### B. Clayton Act Jurisdiction.

Kowalski contends that there is no Clayton Act jurisdiction as there was no "interstate sale." In support of this position, it cited many Robinson-Patman Act cases. But as the Supreme Court's decision in Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) makes clear, jurisdiction under the Robinson-Patman Act and jurisdiction under the Clayton Act are not the same.

The *Copp* case concerned the jurisdictional requirements of § 2(a) of the Robinson-Patman Act and §§ 3 and 7 of the Clayton Act. The defendant's sales of asphaltic concrete were entirely intrastate. The 9th Circuit found that the jurisdictional requirements were satisfied by the fact that sales of asphaltic concrete were made for use in construction of interstate highways. The Supreme Court reversed.

The Court noted that jurisdiction under the Sherman Act was intended to be as broad as the Constitution allowed. In contrast, the language of the Clayton and Robinson-Patman Act provisions appeared to reach only those persons or activities within the flow of interstate commerce and that this requirement would not be met by a mere showing that the illegal activities complained of had an effect on commerce. In discussing what evidence would show the requisite jurisdiction, the court stated:

> Unless it appears (i) that Sully-Miller engages in interstate commercial activities (§ 7), (ii) that Industrial's alleged exclusive dealing arrangements and discriminatory sales occur in the course of its interstate activities (§§ 2(a) and 3), and (iii) that at least one of Industrial's allegedly discriminatory sales was made in interstate commerce (§ 2(a)), Copp's claims must fail. (419 U.S. at 195, 95 S.Ct. at 398)

The requirement of an actual interstate sale only applied to § 2(a) of the Robinson-Patman Act. The jurisdictional requirement of § 3 of the Clayton Act was only that the illegal activity occur in the course of interstate commerce. Thus, Kowalski's contention that there is no Clayton Act jurisdiction because there is no interstate sale must fail. As the court's opinion makes clear, the standard for determining Clayton Act jurisdiction was the "stream of commerce" doctrine.

However, it is also interesting to note that the plaintiff also advanced the theory that Clayton Act jurisdiction should not be limited to the stream of com-

merce theory, but should extend as far as the Sherman Act. The court did not reject this argument, but neither did it accept it.

This argument from the history and practical purposes of the Clayton Act is neither without force nor at least a measure of support. But whether it would justify radical expansion of the Clayton Act's scope beyond that which the statutory language defines—expansion, moreover, by judicial decision rather than amendatory legislation—is doubtful. In any event, this case does not present an occasion to decide the question. (419 U.S. at 202, 95 S. Ct. at 402)

■ Thus, DCD's argument that Clayton and Sherman Act jurisdiction are co-extensive is also unavailing. As the court reads the *Copp* opinion, as well as the Clayton Act cases decided before *Copp*, the court believes that the prevailing standard for Clayton Act jurisdiction is the "stream of commerce" test. The only question is whether that test has been met in this case.

■ In a stream of commerce analysis, the usual problem centers around a determination of whether or not particular goods "come to rest" before their involvement with the illegal conduct.

Although Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943) was a case under the Fair Labor Standards Act, its discussion of the stream of commerce doctrine has been relied on by many courts for use in antitrust cases. The question involved in *Jacksonville Paper* was whether or not the act applied to employees of the defendant who did not deliver goods across state lines where the goods were procured by the defendant from interstate commerce. The merchandise delivered by these employees fell into three categories: (1) Merchandise which was shipped directly to customers. (2) Merchandise purchased on special orders which were first taken off of the interstate carrier and checked before being delivered to the customer but which did not pass through a warehouse. (3) Merchandise which passed through a warehouse before delivery. This third category constituted the bulk of the merchandise. There was evidence that most of the customers' orders were recurrent and their needs could be anticipated. Some, but not all, of the customers had either a contract or understanding with the defendant with respect to future needs, but there was evidence that the manager could predict the needs of all the customers before placing an order. The Fifth Circuit held that only the delivery of goods procured through special order, as well as those going directly to the customer, was employment "in commerce" under the Act.

This finding was challenged by the plaintiff. One argument was that this finding held that a stop at a warehouse was sufficient to deprive the goods of their interstate character. The Supreme Court agreed that a stop at a warehouse was not sufficient to change the character of the goods:

It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce . . . . No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey . . . (I)f the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain "in commerce" until they reach those points. (317 U.S. at 567, 568, 63 S.Ct. at 335)

The Court held that the goods ordered pursuant to a pre-existing contract or understanding with the customer were "in commerce" until delivery to the customer. "The contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate move-

ment should terminate." (317 U.S. at 569, 63 S.Ct. at 336).

However, the Court declined to hold that the goods ordered "in anticipation" of customer orders were "in commerce" until delivery. By doing so, the Court did not mean to foreclose the possibility that in some circumstances goods ordered "in anticipation" could be considered "in commerce:"

> We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods "in commerce" within the meaning of the Act . . . We do not believe, however, that on this phase of the case such a course of business is revealed by this record. The evidence said to support it is of a wholly general character and lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition. (317 U.S. at 570, 63 S.Ct. at 336)

In the *Jacksonville Paper* case, the Supreme Court seemed to focus on the question of the intent of the parties in determining whether the stream of commerce ended before the goods reached the buyers of the defendant. Did the defendant intend that purchased goods would stay in the warehouse for an indeterminate amount of time until they were somehow disposed of, or did the defendant, when he purchased the goods, intend to dispose of them to a particular customer or customers within a short time? Lower courts have also focused on the issue of intent. The requisite intent has been inferred when the goods are perishable.

In Pevely Dairy Co. v. United States, 178 F.2d 363 (8th Cir. 1949), the defendants were charged with price fixing in violation of § 1 of the Sherman Act. All of the milk sold by the defendants was sold within the state of Missouri.

However, at least one half of the milk sold was shipped from Illinois. When the milk was received in Missouri, it was inspected, cooled, pasteurized, bottled and capped before being sold. The court held that there was jurisdiction unless the milk came to rest for the purposes of processing, thus losing its character as a commodity of interstate commerce. In finding that the milk had not come to rest, the court made the following statements:

> Fluid milk is a perishable commodity which can not be stored as can ordinary merchandise . . . It was within the contemplation of the parties that the milk should continue its course until delivered by the handlers to consumers in the St. Louis area . . . In Binderup v. Pathe Exchange, supra, the court said [263 U. S. 291, 44 S.Ct. (96) 99 (68 L.Ed. 308)], "The general rule is that when transportation has acquired an interstate character 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.'" (178 F.2d at 366)

See also Universal Milk Bottle Service v. United States, 188 F.2d 959 (6th Cir. 1951).

■ In finding that goods are still in the stream of commerce, even though they have made a stop at a warehouse, the intent and understanding of the parties is crucial when there is no pre-existing order for the goods. If the goods are perishable and/or if the parties intended that they would be quickly sold, the stream has not ended. But if the expectation is that the goods would be stored in the warehouse for some time, the stream has ended.

■ After a careful review of the record of this case, the court cannot say that the hams were still in the stream of commerce when sold to the franchise dealers. The evidence discloses only a general outline of the Kowalski procedures. It appears that Kowalski places

an order with various distributors and when the product arrives, it is placed in the warehouse. The Kowalski driver-salesmen place an order for various products. This order is filled at the warehouse and the products are loaded into a refrigerated truck used by the ordering driver-salesman. The driver-salesmen call on the retail stores on their particular routes and discuss the retailer's needs that day. If the retailer wishes to purchase products from Kowalski, the driver-salesman will immediately fill the order from the goods in his truck. Apparently if he does not have the particular product, he will deliver it the next time he stops at the store. At the end of the day, the driver-salesmen return to the warehouse. Any goods which were not sold remain in the truck. The driver-salesmen collect the price of the goods from the retailer. Kowalski bills the driver-salesmen for the goods sold, but the price charged the salesmen is less than the price charged the retailer so that the salesmen end up with a commission on the goods sold.

While there is evidence that many of the goods carried by Kowalski were perishable, there is no evidence that the Polish hams were of this nature. In fact, the hams were canned and thus did not have the same characteristics of perishability as fresh meat or dairy products. There is also testimony that meat is constantly coming into the warehouse, is processed and goes out again. However, as the court reads the record, this testimony was concerned with the raw meat bought by Kowalski for use in the products which Kowalski manufactured. There is no evidence concerning the amount of time that hams will spend in the warehouse. Furthermore, the testimony indicates that when Kowalski purchases hams, they are not earmarked for a particular customer but that they just go into the area of the warehouse where hams are stored.

There is testimony that the total inventory in the Kowalski warehouse will turn over about eight to ten times during a year. However, this testimony is too general as it relates to the amount of time the hams spend in the warehouse. There is no evidence of how often Kowalski orders hams, which evidence might disclose how quickly Kowalski disposes of the hams.

In short, there is no testimony from which the court can find that Kowalski ordered hams in anticipation of customer orders such that the anticipation would demonstrate the kind of intent possessed by a wholesaler who purchases pursuant to special orders, contracts or understandings. Certainly Kowalski anticipates its customers' needs in the sense that it will not buy more than it believes that it can sell. However, there is no time element involved in this anticipation, nor is this the kind of anticipation which would demonstrate the requisite intent that the goods remain in the flow of commerce until delivered to the retailer. As the Supreme Court said of the evidence in the *Jacksonville Paper* case, "the evidence . . . is of a wholly general character and lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition." (317 U.S. at 570, 63 S.Ct. at 336).

Having found no Clayton Act jurisdiction, judgment must be entered in favor of Kowalski with regard to the plaintiff's claims under the Clayton Act. However, as the court has found both Sherman Act jurisdiction and a Sherman Act violation, judgment will be entered in favor of the plaintiff with regard to its Sherman Act claims. A date will be set for a hearing on the damages sustained by Detroit City Dairy, Inc. as a result of Kowalski's Sherman Act violations.